Roger L. DRINKWATER et al.

v.

PATTEN REALTY CORP. et al.

Supreme Judicial Court of Maine.

Argued June 8, 1989.
Decided Aug. 11, 1989.

James W. Strong, Randal E. Watkinson (orally), Strout, Payson, Pellicani, Hokkanen, Strong & Levine, Rockland, for plaintiffs.

Kenneth R. Clegg (orally), Bourque & Clegg, Sanford, for defendants.

Before McKUSICK, C.J., and
WATHEN, GLASSMAN, CLIFFORD,
HORNBY and COLLINS, JJ.

McKUSICK, Chief Justice.

This is a complex dispute arising from a contract to sell a house lot entered into by defendant Patten Realty Corporation with plaintiffs Roger and Beverly Drinkwater. Patten, having subsequently conveyed the lot to Joseph R. O'Brien, the other defendant, contends that the Drinkwaters agreed to rescind the sales contract. The Drinkwaters seek to set aside the conveyance to O'Brien, who is an officer and director of Patten, and to obtain specific performance. The Drinkwaters also contend that Patten made material misrepresentations and committed unfair trade practices in inducing them to enter into the sales contract. The Superior Court (Knox County, *Perkins, J.*) entered summary judgment for Patten and O'Brien on all counts. Because the record reveals a genuine issue of material fact on the Drinkwaters' specific performance claim, we vacate that part of the summary judgment. We affirm the balance of the judgment, as well as the Superior Court's denial of the Drinkwaters' motions to amend their pleadings and for a jury trial.

The Drinkwaters are Florida residents, but Roger Drinkwater, a former lighthouse keeper, originally came from Rockland and still has relatives in the area. In August of 1984 the Drinkwaters had some telephone conversations with Patten representatives about Penobscot Bay Mountain, a 61-lot Patten subdivision in Rockland. They flew to Maine on August 30 to tour the site and the next day signed with Patten a purchase and sale agreement for Lot No. 5, measuring some 6.1 acres and located at the main entrance to the development. There was some discussion of Patten's plans to build an entrance gate that would encroach to some degree on the lot, but nothing was put in writing in that regard.

Later the parties scheduled a closing for October 31. When the Drinkwaters came to Maine to inspect the property on October 30, however, they saw a large area staked off in the corner of Lot No. 5, where they learned Patten was planning to build the gate and to place a sign. The Drinkwaters then for the first time retained counsel. At the scheduled meeting the next day Patten was willing to tender only a deed reserving an 875-square-foot gate easement, and the Drinkwaters refused to go through with the closing.

Negotiations over the next month between the parties' lawyers concluded with two letters that crossed in the mail. Having received a draft deed from Patten's lawyer along with a request for an "early reply," the Drinkwaters' lawyer wrote back on December 9 that

I have forwarded the papers to the Drinkwaters and I believe they will find

them in order. I recommended an early closing....

But a December 7 letter from Patten's lawyer, which crossed in the mail, announced:

As a result of your client's failure to close his purchase of Lot No. 5, my client is terminating its purchase and sale agreement. The Treasurer of Patten Realty Corporation of Maine will be mailing directly to Roger and Beverly Drinkwater their earnest money deposit....

The Drinkwaters received the refund check but did not cash it immediately. Instead, they retained new counsel and demanded performance of the contract. Their new lawyer wrote them on December 31 that "the land in question has subsequently been sold," and the Drinkwaters then cashed the refund check on January 7, 1985. Only later did they learn that Patten had conveyed Lot No. 5 to one of its own employees, defendant O'Brien. Changing counsel once more, the Drinkwaters commenced this action in the Superior Court on April 26, 1985, by filing a four-count complaint.

The Drinkwaters' claims fall into two factual and legal nuclei. Counts I and II are contractual in nature, alleging that Patten failed to perform its obligation on October 31, and in December repudiated the contract and engaged in "willful and fraudulent self-dealing" with its officer O'Brien. Count I seeks damages for breach of contract, and Count II (the only count implicating defendant O'Brien) seeks specific performance and incidental equitable and monetary relief. Counts III and IV sound in tort, alleging unlawful and deceptive conduct by Patten in negotiating the purchase and sale agreement. Count III seeks relief under the Maine Unfair Trade Practices Act (UTPA), 5 M.R.S.A. § 213 (1989), and Count IV seeks common law damages for deceit.

Analyzing these two sets of claims in turn, we first conclude that the Superior Court erred in granting summary judgment for defendants on the claims arising out of the events associated with Patten's "termination" of the contract and conveyance to O'Brien on December 7, 1984. Summary judgment was appropriate, however, on the claims arising out of the events in August of 1984 leading to the formation of the contract. Finally, we reject the Drinkwaters' further contention on appeal that the Superior Court erred in denying their motions to amend and their motion to restore their case to the jury list.

## I.

### Claims Arising out of the Breakdown of the Contract

The first factual nucleus here at issue, giving rise to Counts I and II of the Drinkwaters' action against Patten, comprises the breakdown of the October 31 closing, the subsequent negotiations culminating in Patten's conveyance to O'Brien and its declaration that it was terminating the purchase and sale agreement, and the Drinkwaters' negotiation of the refund check. The Drinkwaters contend that Patten's termination repudiated the contract and that they remain entitled to specific performance, while defendants contend both that the termination was an appropriate response to the Drinkwaters' prior repudiation of the contract and that it was subsequently ratified by the Drinkwaters' implied agreement to rescind the contract. We conclude that on this record the facts not reasonably in dispute are insufficient to compel a judgment either way as a matter of law.

It is undisputed that Patten executed a written agreement to convey Lot No. 5 to the Drinkwaters and that Patten has not done so. Furthermore, nothing in the summary judgment record controverts the conclusion from the fact of his employment by Patten that O'Brien was not a bona fide purchaser.[1] In these circumstances, any judgment for either defendant on the Drinkwaters' specific performance claim must rest on some affirmative defense by Patten. As alternative bases for affirming

---

1. For purposes of this decision, we have no need of determining whether the bona fide question remains open for trial in the Superior Court.

the judgment in its favor, Patten asserts three affirmative defenses: 1) that the Drinkwaters by accepting the refund agreed to rescind the contract; 2) that the Drinkwaters earlier had repudiated the contract by demanding modifications as a condition of performance; and 3) that the Drinkwaters violated the "time is of the essence" clause of the contract.

■ First, we conclude that the alleged rescission is on this record a question of fact rather than law. An agreement to rescind a contract is itself a contract and must be evaluated by principles of contract law. *See Restatement (Second) of Contracts* § 283 & comment a (1981). There appears on the record no express offer to rescind the contract and no express acceptance. Patten, announcing unilaterally that it was "terminating" the contract, sent the Drinkwaters an unconditionally negotiable check refunding the earnest money deposit, and the Drinkwaters negotiated that check. The question therefore is whether the parties by their conduct manifested a mutual intention to rescind. *See id.* § 19. Whether cashing the check manifested an intention to rescind the contract cannot be determined in this situation by resort to any *per se* rule or conclusive presumption; the relevant facts must be ascertained from the totality of the circumstances. *See Emerson v. Sweet,* 432 A.2d 784, 785–86 (Me. 1981) (vacating summary judgment for defendant, even though plaintiff had cashed check "ISSUED FOR: All liability caused by accident described" because other notations on the check raised factual question as to scope of "accident described").

From the record viewed in the light most favorable to the parties against whom the summary judgment was granted, a factfinder could rationally infer that the Drinkwaters reasonably believed at the time they cashed the check that Patten had sold the property to another customer, and reasonably concluded that failing to ·cash the check "would be a futile act ... not required by law." *Cf. O'Halloran v. Oechslie,* 402 A.2d 67, 70 (Me.1979) (affirming decree of specific performance because following vendor's repudiation of contract, "futility excused the tender of the purchase price"). The record at this stage leaves unresolved two crucial factual questions: whether the Drinkwaters by cashing the check manifested an acceptance of the rescission of their contract and whether— even if the Drinkwaters by their conduct are objectively taken to have agreed to rescind—that rescission was voidable for mistake or fraud because the Drinkwaters so agreed in reasonable reliance on an erroneous belief that the property had been sold to a bona fide purchaser. The defense of rescission is therefore insufficient to support the summary judgment.

■ The second affirmative defense, repudiation, likewise presents an unresolved question of material fact. The deed tendered by Patten at the October 31 meeting contained two provisions that were absent from the purchase and sale agreement of August 31: in addition to the reservation of a gate easement, the deed incorporated by reference a "Declaration of Restrictive Covenants, Common Easements, Exceptions and Reservations" (the Declaration). In August Patten had given the Drinkwaters a "Proposed Declaration" substantially similar to the final version, and had responded to several questions raised by the Drinkwaters in regard to its terms. The Proposed Declaration, however, was not signed and was not referred to in the documents signed by the parties to the purchase and sale agreement.

At the October 31 meeting the Drinkwaters, in refusing to close the sale, objected only to the proposed gate easement, not to the deed restrictions set forth in the Declaration. On November 26, however, the Drinkwaters' lawyer responded to Patten's offer to convey the property with no gate easement by threatening to sue for specific performance if the deed did not conform "to the exact terms and conditions of" the sales agreement. "As I read said contract," the Drinkwaters' lawyer wrote, "[n]o mention is made ... of easements or of any deed restrictions...."

Patten's lawyer replied on November 30, both by telephone and by letter, that Patten's understanding of the negotiations

was that the Drinkwaters would accept a deed without the gate easement but with the covenants and other restrictions set forth in the Declaration, an integral part of the subdivision plan. He enclosed a draft deed incorporating the Declaration by reference and closed by saying:

> Therefore, I again repeat that my client is ready, willing and able to deliver the warranty deed to them identical to the copy enclosed.

> May I please have the benefit of your early reply to [sic] your clients' position. Thank you very much for your attention to this matter.

Seven days later Patten's lawyer followed with another letter announcing that Patten was "terminating" the contract; Patten on the same day conveyed the property to O'Brien. Because the contract contained no termination clause, whether those acts constituted a repudiation by Patten or merely responded to a prior repudiation by the Drinkwaters must be decided by common law principles. As a general rule, a request or demand to modify a contract does not by itself constitute a repudiation unless the party seeking the modification threatens a total breach of the contract. *See Restatement (Second) of Contracts* § 250 & comment b; 4 *Corbin on Contracts* § 973 (1951).

■ The Drinkwaters do not dispute that Patten could fairly have taken their lawyer's statement, though phrased simply as an interpretation, as an insistence on a modification of the contract. A party to a contract with reasonable grounds to believe the other party will not perform may demand assurance of performance and may treat as a repudiation a failure to provide adequate assurance within a reasonable time. *See Restatement (Second) of Contracts* § 251. How much time is reasonable depends on the circumstances of the case, which here include the time of year and the geographic separation between the Drinkwaters and their Maine attorney. On this record, whether the Drinkwaters through their lawyer committed a *per se* repudiation or threatened a repudiation is a question for the factfinder, as is the ques-

tion whether Patten, seven days after requesting "the benefit of your early reply," was justified in treating the nonreceipt of any response from the Drinkwaters as a repudiation.

■ The last affirmative defense, that the Drinkwaters were in breach of the preprinted "time is of the essence" clause in the purchase and sale agreement, has no merit. Patten argues that the Drinkwaters, knowing that time was of the essence, "dillydallied at their peril." The phrase "time is of the essence," however, does not mean "make haste." It creates no independent obligation, but rather signifies that a party in breach of an obligation to perform at the *agreed* time thereby forfeits the right to demand performance from the other party. *See Colbath v. H.B. Stebbins Lumber Co.*, 127 Me. 406, 411, 144 A. 1, 3 (1929). Patten has made no showing that there was ever any agreed time when the Drinkwaters failed to perform. The written purchase and sale agreement itself specifies only that "[p]ossession [is] to be given on or before 15 days following completion of road in front of said parcel." Even if that clause specifies the date agreed to be "of the essence," there is at the very least a factual dispute regarding whether the road was complete at any time in 1984.

■ Because each of Patten's affirmative defenses leaves unresolved a genuine issue of material fact, the Drinkwaters' claim for specific performance of the purchase and sale agreement and the nullification of Patten's conveyance to O'Brien must proceed to a trial of the facts. We therefore vacate the summary judgment on Count II. In addition to their request for equitable relief, however, the Drinkwaters have also inserted into Count II of their complaint a request for punitive damages. No matter how egregious the breach, punitive damages are unavailable under Maine law for breach of contract: "There is a distinction ... between fraud that will vitiate a contract and fraud that is actionable as deceit." *See Forbes v. Wells Beach Casino, Inc.*, 409 A.2d 646, 655 (Me.1979). Although the Drinkwaters on appeal now

argue that Count II should be reinterpreted as alleging tortious conduct, they have conceded that throughout the course of the Superior Court proceedings both sides treated the allegations of "willful and fraudulent self-dealing" as being directed exclusively toward the Drinkwaters' claim for equitable relief for the alleged breach of contract. The summary judgment must be affirmed as to the issue of punitive damages.

## II.

### *Claims Arising out of the Formation of the Contract*

On the claims of Counts III and IV of the Drinkwaters' complaint, which arise out of the second factual nucleus, the events leading up to the October 31 dispute, the summary judgment must also be affirmed. According to the Drinkwaters, Patten misled them when showing them the property and negotiating the purchase and sale contract in late August 1984. In particular, Count IV of their complaint alleges that Patten misrepresented both its plans for the gate easement and the legal effect of the Proposed Declaration it gave the Drinkwaters. On this record we conclude as a matter of law that the Drinkwaters' allegations against Patten regarding these events are not actionable either under the UTPA or in deceit.

First, under the UTPA a consumer's relief in a private action is limited to "restitution and ... such other equitable relief ... as the court may deem to be necessary and proper." 5 M.R.S.A. § 213(1). The consumer has no private action under the UTPA, even if unfair trade practices have in fact been committed, unless those practices have not only harmed the consumer but also benefited the dealer. *See Bartner v. Carter*, 405 A.2d 194, 203–04 (Me.1979). The factual similarities between *Carter* and the case at bar are decisive. In *Bartner v. Carter* the plaintiffs had responded to an advertisement for a house that overstated the acreage to be sold. They became aware of the misrepresentation, however, while the purchase and sale contract was still executory. The defendant real estate brokers offered to refund the buyers' deposit and rescind the contract, but the buyers chose instead to pay the contract price for the real estate as is, expressly reserving the right to assert whatever legal claim they had to the advertised acreage. *Id.* at 198. The buyers then sued the brokers, seeking *inter alia* restitutionary relief under the UTPA. We affirmed the Superior Court's judgment for the brokers. We held that restitution under the UTPA in that factual context involved no remedy beyond the refund of the buyers' deposit, and that the buyers gave up any UTPA remedy by rejecting the brokers' offer to refund the deposit. *Id.* at 204. Likewise in the case at bar, Patten, in sending the refund check, tendered complete restitution of all benefit it had obtained by the alleged unfair trade practices in negotiating the purchase and sale agreement. By cashing the refund check, the Drinkwaters have already received all they would be entitled to under the UTPA on Count III.

Second, the Drinkwaters' affirmation of the sales contract precludes any recovery for deceit on Count IV. Without in any way deciding whether the Drinkwaters' deceit claim on this record could survive summary judgment with respect to the other required elements of a plaintiff's proof in an action for deceit, we conclude from the undisputed facts that the Drinkwaters ultimately did not rely to their detriment on any misrepresentation made by Patten in the course of negotiating the contract. Their deceit claim therefore lacks an essential element. *See Rodrigue v. Morin*, 377 A.2d 476, 481 (Me.1977). Even if on August 31 the Drinkwaters entered into the purchase and sale agreement on the basis of some misapprehension of the material facts, they ratified that decision after learning the true state of affairs and elected to pay the full contract price for the property. Indeed, even after their second attorney advised them to accept the refund, rescind the contract, and attempt to recover their incidental expenses, the Drinkwaters chose instead to sue for specific performance, manifesting a continuing

desire to obtain Lot No. 5 on the very terms of the contract they allege was fraudulently induced. Whether it was in fact fraudulently induced therefore becomes irrelevant.

Thus we affirm the summary judgment for defendants on Counts III and IV, being the Drinkwaters' claims under the UTPA and for common law deceit arising out of the events of August 30–31, 1984.

### III.

#### *Other Issues Raised on Appeal*

Finally, in addition to the substantive issues we have discussed, the Drinkwaters on appeal also challenge the Superior Court's denial of three procedural motions: the Drinkwaters' motion to amend their complaint, their motion to amend their pretrial conference report, and their motion for a jury trial. On May 18, 1988, five days before trial was scheduled to begin,[2] the Superior Court (*Silsby, J.*) held a hearing on various pretrial motions of defendants. At that hearing the Drinkwaters orally moved to amend the complaint in response to arguments by the defense that the Drinkwaters were at the last minute raising new issues in their tort claims. The court ruled that amendment at that date would be "hugely prejudicial to the defense" and denied the oral motion. After the trial was continued, the Drinkwaters filed written motions to amend the complaint and to amend the pretrial report so as to expand and clarify their allegations of Patten's misconduct in August of 1984. On September 23, 1988, the Superior Court (*Perkins, J.*) decided the written motions together with defendants' motion for summary judgment, denying the motion to amend the complaint as untimely and denying the motion to amend the pretrial report as moot.

The decision whether to grant a motion to amend is a matter left to the discretion of the trial court, mindful that leave to amend "shall be freely given when justice so requires." M.R.Civ.P. 15(a); *see McKinnon v. Tibbetts*, 440 A.2d 1028, 1030 (Me.1982). The Drinkwaters first moved to amend more than three years after the commencement of the action and only five days before the scheduled trial date. The parties offered conflicting explanations to the court for what caused the delay and who was responsible. The motion justices were well situated to evaluate those explanations, and acted fully within the scope of their discretion.

The final procedural motion at issue arises out of the court's order, entered at the May 18 motion hearing, that the Drinkwaters elect between their claim for equitable relief and their demand for trial by jury. They chose to proceed with their action for specific performance, while challenging the order for election of remedies. On appeal the Drinkwaters, reaffirming their choice to pursue equitable relief in their action to enforce the purchase and sale agreement, concede that they thereby waive their right to trial by jury on their contract claim.[3] *See Supruniuk v. Petriw*, 334 A.2d 857, 858 (Me.1975). Thus, if the Drinkwaters had any entitlement to trial by jury it would be by virtue of their tort or UTPA claims. At oral argument before us, however, they conceded that all tort and UTPA claims they have raised in the Superior Court dealt with Patten's conduct in August of 1984 in connection with formation of the contract. As we discussed in Part II above, the Superior Court properly granted summary judgment for Patten on all claims arising out of that conduct. As to those claims, the Drinkwaters have no right to any trial, jury or nonjury, and their motion for a jury trial was therefore properly denied as moot.

To summarize, the Drinkwaters are entitled to a nonjury trial in their action to set aside the conveyance to O'Brien and to

---

2. A senior partner in the law firm representing the Drinkwaters died four days later and the trial was continued. On July 8, 1988, defendants moved for summary judgment, which the court granted after a hearing on September 23.

3. We do not understand that the Drinkwaters by their concession give up a contract claim for money damages if the Superior Court concludes it cannot order specific performance.

obtain specific performance and related relief from Patten. In all other respects the judgment is affirmed.

The entry is:

*Judgment for defendants on plaintiffs' specific performance claim under Count II vacated; balance of judgment affirmed.*

*Remanded for further proceedings consistent with the opinion herein.*

All concurring.