Ronald MASURE, et al.,
Plaintiffs, Appellees,

v.

John B. DONNELLY, Defendant,
Appellant.

Ronald MASURE, et al., Plaintiffs,
Appellants,

v.

John B. DONNELLY, Defendant,
Appellee.

Nos. 91–1954, 91–2000.

United States Court of Appeals,
First Circuit.

Heard March 2, 1992.

Decided April 24, 1992.

<hr />

Bernard J. Kubetz, Bangor, Me., with whom Thad B. Zmistowski and Eaton, Peabody, Bradford & Veague were on brief, for defendant, appellant.

Jed Davis, Augusta, Me., with whom Jim Mitchell and Jed Davis, P.A., were on brief, for plaintiffs, appellees.

Before TORRUELLA, Circuit Judge, CAMPBELL and WEIS,* Senior Circuit Judges.

LEVIN H. CAMPBELL, Senior Circuit Judge.

In this diversity action under Maine law, plaintiffs sued the builder who sold them a house. Plaintiffs sought to recover under three theories: 1) negligent construction of the house, 2) breach of implied warranties of habitability and workmanlike construction, and 3) unfair and deceptive acts in violation of Maine's Unfair Trade Practices Act ("UTPA"), Me.Rev.Stat.Ann. tit. 5, § 207, et seq. The district court granted

* Of the Third Circuit, sitting by designation.

defendant's motion for a directed verdict on the negligence claim. The remaining claims went to a jury, which, answering questions on a special verdict form, found for defendant on the warranty claim and for plaintiffs on the UTPA claim. The district court entered judgment for the plaintiffs and denied defendant's motion for judgment notwithstanding the verdict.

Defendant appeals on a number of grounds related to the UTPA claim. Plaintiffs cross appeal, claiming that the district court erred in granting the directed verdict on the negligence claim. We affirm the district court's judgment on the UTPA claim and need not consider plaintiffs' cross appeal.

## I.

Plaintiffs are Ronald and Rosalie Masure. Ronald Masure has been a real estate broker since 1981. He deals primarily in land sales, but has had some experience in construction management. Defendant John Donnelly is a home builder.

Ronald Masure testified to the following. Prior to this incident, Donnelly and Masure had met through business and became friends. In September 1989 the Masures expressed an interest in buying a house Donnelly was then completing on Moosehead Lake in Northern Maine. They were particularly impressed with the view of the lake from the house. Donnelly informed the Masures that the asking price was $237,500, but that he would sell them the house directly, avoiding a broker's commission, for $210,000.

Having visited the house three or four times and bargained the price down to $190,000, the Masures signed a purchase and sale agreement (the "Agreement") on September 26, 1989. They signed the Agreement in the offices of attorney Richard Edwards; Donnelly was not present. At that time, the Masures were unaware of any problems with the house.

After signing the Agreement and tendering a check for $3,000, the Masures began to notice problems with the house. Ronald noticed that light fixtures had not been installed but, during a three-way phone conversation with Donnelly and Edwards, was informed by Edwards that "at that price you're not getting any appliances." Ronald also mentioned that there was water in the basement and was advised to use "water plug [ ] goop" to fix the problem himself.

Having noticed these problems, the Masures moved into the house on October 2, 1989. Pursuant to the Agreement, they were allowed to live there rent-free until November 15, the anticipated closing date. If they did not close by November 15, the Masures would have to pay rent beginning on that date. In fact, the closing did not take place until December 4 because one of Donnelly's subcontractors placed a mechanic's lien on the property. The Masures refused to pay rent for the period between November 15 and December 4.

Donnelly was not present at the December 4 closing. At the closing, the Masures handed to attorney Edwards a document listing several defects with the house and purporting to "serve notice that we may be persuing [sic] some remedies in the future from the seller." The following problems were listed:

1. The house is moving. Several of the doors and windows do not line up and can't be closed.

2. There are several major drafts between logs. One place in the upstairs bedroom you can see outdoors where the logs meet.

3. The house as it now sits does not match the plans submitted to LURC [a state permitting agency]. Location of the house and driveway differ.

4. The mud room leaks and there are water stains where the mud room meets the house.

5. We have reason to believe that the basement takes on water during rainy weather.

6. A fire inspector has told us that the place built in the living room for a woodstove does not meet the state fire code and that we would not be allowed to put a woodstove there.

7. Several snap-in grills on the windows are missing. Several screens and one window molding are missing.

Nevertheless, the Masures went ahead with the closing.

During the winter some of the problems worsened. At one point, a small snowdrift built up in the living room. Sediment settled in the water system, clogging the pipes. There was also a slight problem with the wiring.

Masure expected Donnelly to respond to the concerns he expressed at the closing, but Donnelly never did. In addition to the list of problems presented at the closing, Masure sent letters to Donnelly dated January 24, 1990, and February 20, 1990, asking Donnelly to respond to some of his concerns. The former was sent by certified mail to three addresses, including one in the Virgin Islands where Donnelly was working. Donnelly never responded to these letters.

In addition to the problems with the house itself, Masure's January 24, 1990 letter, which was introduced into evidence, pointed out a problem with the view. The letter stated that a representative of a local homeowners' association had told Masure that trees and bushes which had been cut down in a strip of land between the house and the lake would have to be replanted, blocking the view of the lake. The letter claimed that Donnelly "did not tell [Masure] that the view [he] was buying was going to change soon."

Further information about this point was provided by Edward Williams, former president of the homeowners' association. Williams testified that the association owned a strip of land bordering the lake (the "green belt") which was cut "almost on a clear cut basis" by Donnelly in July 1989. The association sent Donnelly a letter at that time stating that, if he did not plant at least 100 trees in the green belt, it would deny him any further building permits in the area. Donnelly planted no trees. The association planted some trees

itself, during the summer of 1990, but most died. However, Williams testified that Masure would not be required to plant the trees himself, nor did the association have any plans to do so.

Rosalie Masure corroborated Ronald Masure's version of events.

Donnelly's version of events differed in some important respects. First, Donnelly testified that, when he first met with Masure and lowered the price from $237,500 to $210,000, he told Masure that the deal would be on an "as is" basis. In other words, at that price, Donnelly would not return to the site to correct any problems. This was denied by the Masures, and both Donnelly and attorney Edwards testified that there had never been any discussion of putting an "as is" clause in the Agreement. No such clause, in fact, was inserted. Donnelly also testified that the three-way telephone conversation during which Masure learned of the lack of fixtures and the water in the basement occurred before the signing of the Agreement.[1] He claimed that closing had been delayed because the Masures had had trouble obtaining financing.

With respect to his failure to respond to Masure's concerns, Donnelly testified that he never received Masure's letters because he was working in the Virgin Islands. Donnelly's wife did receive the letters and told Donnelly about them over the phone, but, because he was doing emergency post-hurricane work, Donnelly was limited to three-minute phone conversations. When he returned to the mainland in April, Donnelly called Masure two or three times and left messages. Masure never returned his calls.

Donnelly also disputed the Masures' claim that the defects were serious. He testified that he had inspected the house shortly before trial, and the physical problems were simple matters normally associated with the construction of a new house. Donnelly claimed that, working with one

---

**1.** Edwards agreed that the conversation occurred before the Agreement was signed but could not recall what was said.

other man, he could fix all of the physical problems in the house in two days. With respect to the view, he stated that he had only cut down dead trees but admitted to having sought legal advice after receiving the letter from the homeowners' association. With respect to the LURC permits, Donnelly stated that the actual position of the house varied some from what was established in the permits. A LURC official had told him that she would take care of getting a certificate of compliance; when she never called again, Donnelly assumed it had been done. Finally, with respect to the fire hazards, Donnelly claimed that Masure had told him he never intended to use a wood stove anyway, but planned instead to refurbish the chimney and hearth areas in order to install a fireplace.

Besides the Masures, Donnelly, Edwards and Williams, four other witnesses testified for the plaintiffs. Fire inspector Daniel Burgess testified that the chimney and hearth area violated the fire code in several respects, mostly related to the use of a wood stove. LURC investigator Kim Lynch testified that Donnelly should have obtained a certificate of compliance indicating that the house complied with certain permits under which it was built. In fact, the house did not comply, but Lynch indicated that it would be a fairly simple matter for the Masures to obtain a new permit, provided there was no problem with the septic system. A friend of the Masures testified that he had fixed a few items in the house for them. Finally, architect Andrew Shapiro testified as to numerous structural and other problems with the house, estimating their total repair cost at approximately $70,000. On cross-examination, Shapiro stated that most of the problems were associated with the movement of the house and water damage noticed by the Masures before the closing, but that a layman would not have understood their full extent.

Four witnesses testified for the defense. Bart Hughes, president of the company which had sold Donnelly the logs for the house, testified that the gaps in the logs were normal for such a home, due to shrinkage of the logs. Hughes had in-spected the house and found that all of the problems could be easily fixed, and none were structural. David Bouchard, a masonry contractor, testified that he had built the chimney and hearth and helped build the foundation. Both had been done skillfully, and Bouchard had offered to correct any problems with the chimney. Contractor Don Tompkins testified that he had constructed the foundation in a skillful manner. Finally, Richard Campbell, owner of his own construction company, testified as an expert witness. He said that the house was of above average quality, and that the few problems that existed were normal and could be repaired for about $1,800.

At the close of all the evidence, the district court granted Donnelly's motion for a directed verdict on the negligence claim. The jury returned a verdict for Donnelly on the warranty claim and for the Masures on the unfair trade practices claim. The district court denied Donnelly's motion for judgment notwithstanding the verdict. The court entered a judgment ordering rescission of the house sale, with attorney's fees and costs to the Masures. On appeal, Donnelly argues that 1) plaintiffs waived their UTPA claim, 2) the evidence warranted a judgment notwithstanding the verdict, 3) the jury's answers to the special verdict questions were inconsistent, and 4) the jury instructions were error.

## II.

### A. *Judgment Notwithstanding the Verdict*

■ Donnelly raises two arguments in support of his motion for judgment notwithstanding the verdict. The district court correctly rejected them both.

First, Donnelly claims that, because the Masures knew of several problems with the house but went ahead with the closing, they waived their claim under Maine's Unfair Trade Practices Act. In *Bartner v. Carter*, 405 A.2d 194 (Me.1979), plaintiffs signed a purchase and sale agreement to buy a house, which was advertised as occupying a ¾ acre lot. Before the closing,

they learned that the lot was smaller than advertised and attempted to negotiate a lower price. The seller refused to lower the price, but offered to rescind the contract. The plaintiffs rejected this offer, went ahead with the closing, and sued for the difference in value between the lot size as advertised and that as sold. The court concluded that the plaintiffs had no remedy under the UTPA because that statute (Me. Rev.St.Ann. tit. 5, § 213) provided only for restitution[2], and "after [plaintiffs] rejected rescission, affirmed the contract, paid the rest of the [negotiated price] and accepted title, they no longer had any restitutionary remedy." *Id.* at 204. Likewise, in *Drinkwater v. Patten Realty Corp.*, 563 A.2d 772 (Me.1989), plaintiffs signed a purchase and sale agreement on a lot and tendered a deposit. After plaintiffs refused to close because of defendants' reservations of certain rights in the property, defendants sold the property to someone else and refunded plaintiffs' deposit. The court held that "complete restitution" occurred when defendants refunded the deposit, and "[b]y cashing the refund check, [plaintiffs] have already received all they would be entitled to under the UTPA...." *Id.* at 777.

This case differs from *Bartner* and *Drinkwater* because it could be found that all elements of the Masures' UTPA claim had not surfaced by the time of the closing. The district court found that "the Masures were not aware of the full extent of the deficiencies at the time they closed." This finding is supported by the evidence. Although they knew about all of the problems on the list tendered at the closing, they testified that those problems worsened afterwards. Moreover, according to Shapiro, the movement of the house and gaps between the logs were due to serious structural deficiencies which a layman would not have detected. In addition, the Masures were entirely unaware of the problem with the view until after the closing. Finally, the Masures' claim was based in part on Donnelly's unwillingness to deal with them after the closing.

To be sure, the Masures may well have had an UTPA claim for rescission of the Agreement at the time of the closing. But, in contrast to *Bartner* and *Drinkwater*, deficiencies unknown at the time of closing came to light thereafter, and further actions (or inactions) by defendant occurred as well. Under these circumstances, the district court correctly refused to hold, as a matter of law, that the UTPA claim had been waived.

With regard to the merits, Donnelly claims that there was insufficient evidence for the jury to find a violation of the UTPA. Our review of this claim is "severely circumscribed." *Conway v. Electro Switch Corp.*, 825 F.2d 593, 598 (1st Cir. 1987). Thus,

> [a] motion for judgment notwithstanding the verdict should be granted only after a determination that the evidence could lead a reasonable person to only one conclusion. This determination must be made without evaluating the credibility of the witnesses or the weight of the evidence and without attempting to resolve conflicting testimony. All inferences must be granted in favor of the nonmoving party.

*Id.* Here, a reasonable jury could have concluded that Donnelly violated the UTPA.

The UTPA provides that,

> [u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are declared unlawful.

Me.Rev.St.Ann. tit. 5, § 207. Any person who purchases real property, "and thereby suffers any loss of money or property" as a result of the use of such practices, may sue for damages, restitution or other equitable relief. *Id.* at § 213.

Maine's Supreme Judicial Court has held that " 'it is impossible to frame definitions which embrace all unfair practices.' " *State ex rel. Tierney v. Ford Motor Co.*, 436 A.2d 866, 873 (Me.1981) (citation omitted). Therefore,

---

**2.** A provision allowing damage suits was added in 1991. *See* 1991 Me.Laws, c. 536, § 1.

[t]he scope of the Unfair Trade Practices Act has yet to be defined by [Maine's Supreme Judicial Court]; its limits can best be drawn on a case-by-case basis in which the issues are sharply focused in light of specific fact situations. [citation omitted]. The conduct against which the complaint is directed should have some attribute of unfairness or deception to trigger the procedures of the UTPA.

*Inniss v. Methot Buick-Opel, Inc.*, 506 A.2d 212, 216 (Me.1986). One general test, incorporated in the district court's charge, is whether "[t]he objectionable conduct [attains] a level of rascality that would raise an eyebrow of someone inured to the rough and tumble world of commerce." *Tierney*, 436 A.2d at 874 n. 14 (quoting *Levings v. Forbes & Wallace*, 8 Mass.App. 498, 396 N.E.2d 149, 153 (1979)).

■ Here, a reasonable jury could have concluded that Donnelly knowingly sold the Masures a house with a number of serious defects, some of them unlikely to be detected in their fullest extent, and then failed to respond to the Masures' requests for corrective measures after the closing. There was no language in the purchase and sale agreement providing for an "as is" sale. Donnelly's unresponsiveness occurred notwithstanding the Masures having served notice at the time of the closing that they were displeased and expected remedial action concerning these defects. Moreover, the lake view which Donnelly could be found to have known was important to the Masures (or at least to buyers in general)[3] had been obtained by Donnelly's unlawful cutting of trees. Donnelly was well aware that the cutting was unlawful and a source of complaint by the homeowners' association, and he had even discussed the reper-

cussions with counsel before the sale. Nonetheless, he entirely failed to inform the Masures of the problem.[4]

We find sufficient evidence for the jury to have determined that Donnelly's conduct violated the UTPA.

## B. *Verdict Inconsistency*

■ Donnelly seeks a new trial on the ground that the jury's answers to the questions on the special verdict form were inconsistent. The district court instructed the jury that "[b]reach of a warranty or failure to honor a warranty is not, in and of itself, an unfair trade practice *but may be considered by you in deciding whether the defendant's overall conduct amounted to an unfair or deceptive act or practice.*" (emphasis added). Donnelly argues that both the warranty and UTPA claims were based on the alleged defects in the house. Because the jury denied the warranty claim, it must have found that the house was constructed in a workmanlike manner. It was therefore inconsistent for the jury to find that the house contained serious defects, in violation of the UTPA.

■ We reject this argument for two reasons. First, by failing to point out the alleged inconsistency before the jury was discharged, Donnelly waived this argument. *See Peckham v. Continental Casualty Ins. Co.*, 895 F.2d 830, 836 (1st Cir. 1990) ("[t]he law is perfectly clear that plaintiffs ... waived any claim of internal inconsistency 'by failing to object after the verdict was read and before the jury was discharged'") (quoting *McIsaac v. Didriksen Fishing Corp.*, 809 F.2d 129, 134 (1st Cir.1987)). Donnelly claims that his failure to raise the issue should be excused be-

**3.** Neither of the Masures explicitly stated that they had told Donnelly the view was important to them. Nevertheless, Ronald Masure testified that one of the reasons they were first attracted to the house was the "beautiful view," and his January 24, 1990 letter implies that he had told Donnelly as much. Moreover, Donnelly was an experienced builder, and there was evidence from which it could be found that he had ordered the green belt to be clear-cut. The jury could therefore infer that he had sought to create a pleasing view in order to attract buyers.

**4.** Donnelly claims that, because it appears doubtful that the homeowners' association will require the Masures to replant, the Masures have not suffered any loss of "money or property." 5 M.R.S.A. § 213. We disagree. A reasonable jury could conclude that the value of the house was lower because the view, though it existed, was in violation of law. A buyer interested in the view might well believe that the view's questionable legal status decreased the value of the house.

cause the verdict was returned at 5:15 on a Friday afternoon and everyone involved was exhausted and ready to go home. However, the use of a special verdict form should alert counsel to the possibility of inconsistency, *see id.; Skillin v. Kimball,* 643 F.2d 19, 20 (1st Cir.1981). We find no merit in this excuse.

Even if Donnelly had timely raised the argument, the jury's answers were not necessarily inconsistent. The jury was instructed that, in order to find for the Masures on the warranty claims, it had to find that "plaintiffs did not know of or could not reasonably have discovered from a reasonable inspection [any defects] at the time they entered into a purchase and sale agreement." The evidence indicated that Ronald Masure was an experienced real estate broker, and the jury might have believed that it was unreasonable for him not to have the house inspected before agreeing to buy it. Such a finding would be consistent with the three factors noted above which are sufficient to sustain a verdict on the UTPA claim: 1) the house contained numerous serious defects about which Donnelly remained silent, 2) Donnelly failed even to respond to the Masures' entreaties to remedy the defects, and 3) Donnelly concealed that he had unlawfully clear-cut the green belt to give the house a pleasant view and that the homeowners' association had complained and sought replanting. *See Merchant v. Ruhle,* 740 F.2d 86, 90 (1st Cir.1984) (rejecting a claim of verdict inconsistency and noting that, when a jury considers " 'different counts or claims,' " the law " 'at times recognizes a jury's right to an idiosyncratic position provided the challenged verdict is based on the evidence and the law' ") (citation omitted).

### C. *Jury Instructions*

■ Donnelly argues that the jury instructions on the warranty claim were error, and that this error affected the jury's resolution of the UTPA claim. The court instructed the jury that certain implied warranties would be breached if there were latent or hidden defects "at the time [the parties] entered into the purchase and sale agreement." Donnelly objected to this instruction, arguing that the correct time for determining latency of defects was the closing (by which time the Masures had spent two months in the house). Although the instruction was given only with regard to the warranty claim, the jury was instructed that it could consider a breach of warranty in deciding the UTPA claim. Thus, Donnelly argues that the erroneous latency instruction prejudiced his case on the UTPA claim. Latency was relevant to determining breach of warranty, which was in turn relevant to the UTPA claim.

We need not decide whether the instruction complained of was erroneous, since any error was harmless. The jury found for Donnelly on the warranty claim. Therefore, any error in the latency instruction was harmless as to that claim.[5]

Donnelly suggests that this alleged instructional error, although given with regard to the warranty claim, somehow infected the finding of a UTPA violation. But it is unlikely a reasonable jury would reject the warranty claim yet then go on to find that Donnelly committed a breach of warranty constituting a UTPA violation. The UTPA instruction merely allowed, but did not require, the jury to base a finding of an UTPA violation on defendant's breach of warranty. As noted above, the jury could have believed that Donnelly should not be held liable for breach of warranty because the Masures should have taken more active measures to discover the defects in the house, but that Donnelly's course of conduct was, overall, unfair or deceptive. Any error in the warranty instruction was harmless as to both the warranty and the UTPA claim.

Finally, the Masures' brief states that, as far as they are concerned, there is no need

---

5. Neither party cites any Maine authority conclusively deciding whether the time of the purchase and sale agreement or the time of the closing should be used in determining whether a defect was latent. Instead, the arguments are based on the law of other jurisdictions which have decided this question. As any error would have been harmless, we shall not attempt to determine what Maine law is on this point.

to decide the issue raised in their cross appeal—whether the district court erred in granting a directed verdict on the negligence claim—if the judgment is affirmed on other grounds. We, therefore, dismiss the cross appeal.

The judgment of the district court is affirmed.

Costs are awarded to the plaintiffs in defendant's appeal, No. 91–1954. Plaintiffs' cross appeal, No. 91–2000, is dismissed without an award of costs to either party.

*So ordered.*