STATE OF MAINE                                  BUSINESS AND CONSUMER COURT

Cumberland, ss.                                 Location: Portland
                                                Docket No. BCD-CV-16-01 ✓


AB HOME HEALTHCARE, LLC
and ABDULFATAH ALI

                    Plaintiffs

          v.

NOBLE ELDER CARE, LLC,
NOBLE HOME HEALTH CARE, INC.
and MOHAMED A. HASSAN

                    Defendants

                          DECISION AND JUDGMENT

          This case came before the court for a jury-waived trial June 15 and 16, 2016.   Plaintiffs

and Defendants presented evidence in the form of sworn testimony and exhibits.

Joint Exhibits 1 through 28 were admitted into evidence by stipulation.

          The trial proceeded on the basis of the Plaintiffs' complaint.   The Defendants'

counterclaims were withdrawn during the trial.   After the Plaintiffs rested, the Defendants

moved for judgment.   The motion was taken under advisement.   After the close of the

evidence, counsel for the parties presented closing argument on legal and factual issues.

          Based on the entire record, the court hereby adopts the following findings of fact and

conclusions of law, and renders judgment as set forth below.

                              *Findings and Conclusions*

          1.   Plaintiff AB Home Healthcare, LLC ["ABHH"] is a Maine limited liability company

doing business in Portland and other communities in southern Maine. The business of ABHH

is to provide personal care and health services to patients in their homes through caregivers

1

employed by ABHH. Most of the patients served by ABHH are receiving services through the State of Maine Medicaid program, known as MaineCare.

2. Plaintiff Abdulfatah Ali is the chief executive officer and member of ABHH. Mr. Ali founded ABHH in 2010 under the name United Home Healthcare Service, LLC. United's name was later changed to AB Home Healthcare, LLC.

3. At all pertinent times, ABHH has provided home health services to its patients through the State of Maine's Medicaid program, known as MaineCare. Typically, a MaineCare patient is referred for services to a home health care agency like ABHH by a care coordinator—an agency responsible for connecting MaineCare patients with the providers of services. In the case of ABHH, many MaineCare referrals came through a care coordinator called Elder Independence of Maine (EIM). The EIM referral process starts when EIM contacts the home health care agency regarding the proposed referral of a patient. After the home health care agency confirms its willingness to accept the patient, the referral is completed; the patient is assigned a caregiver employed by the home health care agency, and the cost of services is billed by the home health agency to the State MaineCare program.

4. In 2013, Mr. Ali invited Defendant Mohamed Hassan to join him in working at AB Home Healthcare. Mr. Ali and Mr. Hassan come from similar backgrounds—both were born in Somalia and both came to the United States while young. Both have earned bachelor's and master's degrees, and both have worked hard to advance themselves.

5. Mr. Hassan became the general manager of ABHH, and was responsible for day-to-day operations, including overseeing the hiring of caregiver employees. As general manager, Mr. Hassan was familiar with the employees of ABHH and also familiar with ABHH's operations. Mr. Ali's focus was less on day-to-day operations and more on business development and regulatory matters. At some point in 2013 or 2014, Mr. Ali granted Mr.

2

Hassan a share of ownership in AB Home Healthcare. Also, at some point while working with Mr. Ali at ABHH, Mr. Hassan signed a non-competition agreement. It appears to be Mr. Ali's practice to require ABHH employees to sign such agreements as a condition of continued employment. The non-competition agreement signed by Mr. Hassan is not in evidence, but it appears to have limited Mr. Hassan's ability to operate a home health care agency in competition with ABHH.

6. In May 2014, Mr. Hassan left ABHH and started his own home health care agency. He created Defendant Noble Elder Care, LLC ["NEC"] as a Maine limited liability company in May 2014 and operated his business through NEC for several months. In December 2014, Mr. Hassan established Defendant Noble Home Health Care, Inc., [NHHC] and transitioned the home health care business to be operated under the aegis of NHHC.

7. In July 2014, Mr. Ali and ABHH filed suit against NEC and Mr. Hassan on various theories of liability, including breach of the non-competition agreement. *See AB Home Healthcare, LLC et al. v. Noble Elder Care, LLC et al.*, Me. Super. Ct., Cum. Cty., Docket No. PORSC-CV-14-0334. Mr. Hassan and NEC responded by denying liability and asserting counterclaims. The case was later transferred to the Business and Consumer Docket. *See AB Home Healthcare, LLC et al. v. Noble Elder Care, LLC et al.*, Me. Bus. & Cons. Dkt., No. BCD-CV-14-051. The parties were represented in that litigation by the same counsel who represent them in the present case. In October 2014, the case was settled and terminated by means of a stipulation of dismissal.

8. During the three months that the case was pending, a large number of ABHH's employees left and began working for NEC. *See* Joint Ex. 25 (summary chart showing dates of hire and termination for ABHH and NEC/NHHC employees. There was no evidence that Mr. Hassan directly solicited any of these employees to switch from Mr. Ali's agency to his agency.

3

9. The terms of settlement were memorialized in a written Settlement Agreement and Release dated October 11, 2014 and entered into evidence at trial as Joint Exhibit 1.

10. The Settlement Agreement and Release was executed by Mr. Ali and Mr. Hassan near the end of a long meeting on October 11, 2016 at the Riverton Community Center in Portland. The meeting was attended by Messrs. Ali and Hassan and also by members of the Somali community in Portland. The dispute between Mr. Ali and Mr. Hassan became a matter of concern to the community, and some of the leaders of the community decided to convene the meeting with the goal of resolving the dispute outside the courts.

11. Mr. Hassan testified that he was essentially forced into signing the Settlement Agreement and Release. He said that most of the community members who attended the meeting were either Mr. Ali's relatives or from his clan, and that they pressured him into signing the Settlement Agreement and Release. The evidence indicates that Mr. Ali came to the meeting with a draft of the Settlement Agreement, and that over the course of the six-hour meeting, which ended after midnight, Mr. Hassan was persuaded to sign it.

12. The Settlement Agreement clearly was prepared by the attorneys for one or both sides, although it recites that it is to be deemed jointly drafted. It is one-sided in some respects—for example, it provides for the release of Mr. Hassan's and NEC's claims against Mr. Ali and ABHH, but not for a reciprocal release of ABHH's and Mr. Ali's claims. Also, the damages provisions appear to focus on damages for breach by Mr. Hassan and NEC rather than any breach by Mr. Ali and ABHH of their obligations. In other respects, it contains provisions benefiting both sides. The provisions of benefit to Mr. Hassan permit him to continue operating NEC in competition with ABHH, and call for Mr. Ali to pay Mr. Hassan a total of $7,500. Some of the provisions of benefit to Mr. Ali prohibited Mr. Hassan from hiring

4

employees who had worked at ABHH within the prior year and accepting as patients persons who had been patients of ABHH within the prior year.

13. Although there is some evidence that Mr. Hassan did sign the Settlement Agreement under some pressure, the Defendants did not plead duress and, at least prior to trial, did not advance the argument that the agreement was voidable due to duress. In fact, the Defendants in their counterclaim sought to enforce the Settlement Agreement and Release against Plaintiffs.

14. Moreover, even if the circumstances under which Mr. Hassan signed made the agreement voidable, his actions after signing can only deemed to have ratified the Settlement Agreement and Release. *See Drinkwater v. Patten Realty Corp.*, 563 A.2d 772, 774-75 (Me. 1989) (voidable contract may be ratified by subsequent conduct). He agreed to the dismissal of the case, including his and NEC's counterclaims; he accepted the $7,500 payment to buy out his ownership interest in ABHH, and he later confirmed the validity of the agreement in communications with Mr. Ali. *See* Joint Ex. 24.

15. For these reasons, the October 11, 2014 Settlement Agreement and Release is generally enforceable against the Defendants, although the enforceability of specific provisions is discussed further below.

16. Moreover, although NHHC is not a named party to the Settlement Agreement and Release, and in fact was created by Mr. Hassan in December 2014, after the Settlement Agreement and Release was executed, the parties have stipulated that NHHC is a successor entity to NEC, *see* Joint Final Pretrial Statement at paragraph 1(B), and the non-competition provisions of the Settlement Agreement and Release are recited to be binding upon successors of the named parties. *See* Joint Ex. 1 at 3.A, 3.B. Moreover, the Defendants' counterclaim filed

5

in this claim recites that the Defendants, including NHHC, are entitled to enforce the Settlement Agreement and Release.

17. Paragraph 3.B of the Settlement Agreement and Release prohibits Mr. Hassan and NEC and their successors in interest from contacting, soliciting or engaging in any business or employee relationship for 24 months with any of ABHH's current employees or with former ABHH's employees who had left ABHH's employ within 12 months of the contact, solicitation or engagement. Joint Ex. 1 at 3.

18. Plaintiffs presented no evidence that the Defendants contacted or solicited current or former employees of ABHH. However, Plaintiffs did present evidence that, after the signing of the Settlement Agreement and Release, NEC and later NHHC hired numerous employees who were working at ABHH on or after the date of the agreement and within a year of their termination at ABHH, in violation of paragraph 3.B of the Settlement Agreement and Release. *See* Joint Exs. 12, 20, 21, 25. According to Joint Exhibit 25, Defendants hired a total of 22 employees who had been employed at ABHH on or after October 11, 2014, within a year of when they left ABHH's employ. As noted above, NEC had hired numerous employees away from ABHH before the Settlement Agreement and Release was signed, and that practice continued even after the date of the Settlement Agreement.

19. Because he was general manager of ABHH until May 2014, Mr. Hassan clearly knew all of the persons employed by ABHH during his time at ABHH, and knew that the Settlement Agreement and Release prohibited his company from hiring those people until they had been gone from ABHH's employ for at least a year. Joint Exhibit 25. On the other hand, there is no evidence that he knew whom ABHH had hired after his departure in May 2014.

20. Accordingly, the hiring by NEC or NHHC of employees within a year of their departure from ABHH were shown to be knowing and willful breaches of the Settlement

6

Agreement only when the employee's employment with ABHH overlapped with Mr. Hassan's employment there. The clearest example of this situation involves a registered nurse, Susan Giffin, who was employed at ABHH from August 2013 until March 2015 and was hired by NHHC in September 2015. The resume she submitted to NHHC lists her employment at ABHH, but Mr. Hassan had to have known of it regardless, because they both worked at ABHH during 2013-14 until Mr. Hassan's departure.

21. Paragraph 3.A of the Settlement Agreement and Release prohibits Mr. Hassan and NEC and their successors in interest from contacting, soliciting or engage in any business relationship for 24 months with any of ABHH's patients "(current and within the past twelve (12) month period) of the date of the contact, solicitation or engagement . . ." Joint Ex. 1 at 3. Plaintiffs presented no evidence that the Defendants contacted or solicited any current or former patients of ABHH. However, the evidence indicated that after October 11, 2014 Mr. Hassan's companies—NEC and later NHHC—accepted at least 19 patients referred through MaineCare within 12 months of their having been patients of ABHH. *See* Joint Ex. 27; *see also* Joint Ex. 26. There was no evidence that the Defendants sought to have these patients referred to NEC or NHHC, or knew before a referral that the patient in question would be referred.

22. Plaintiffs claim they are entitled to damages for each breach of the Settlement Agreement and Release, according to the liquidated damages provision contained in paragraph 5.A of the Settlement Agreement. The operative provision is as follows:

> In the event that Defendants breach any of the provisions of Paragraphs 3.A or 3.B at any time while they remain in effect, then, within thirty 30 calendar days of the occurrence of the breach, the Defendants shall pay to ABHH as liquidated damages, and not as a penalty, the amount of $10,000 per occurrence. The parties recognize that each client represents a different income figure for an agency, depending on the amount of services they require, just as each employee represents a different level of investment by an agency depending on their position, hours, etc. In light of this, the $10,000 liquidated damages provision is arrived at by the parties, in a good faith effort to avoid the difficulty of calculating actual damages in the event of a breach by Defendants. The amount of liquidated damages is believed by all sides to be an approximation of likely

7

damages caused in the event of such a breach and they voluntarily agree that this figure shall be used as a substitute for a calculation of actual damages in the event of such a breach.

Joint Ex. 1 at 5.

23. Paragraphs 3.A and 3.B, the paragraphs referenced in the liquidated damages provision, prohibit Mr. Hassan and NEC (and their successors, such as NHHC) from any contact, solicitation or engagement of the patients and employees within the scope of Paragraphs 3.A and 3.B respectively.

24. The Defendants challenge the validity of the liquidated damages provision at paragraph 5.A. Whether a liquidated damages provision is enforceable is a question of law. "To be enforceable, a liquidated damages clause must meet a two-part test. First, it must be "very difficult to estimate [the damages caused by the breach] accurately," and second, the amount fixed in the agreement must be a reasonable approximation of the loss caused by the breach." *Sisters of Charity Health System v. Farrago*, 2011 ME 62, ¶ 13, 21 A.3d 110, 115, *citing Raisin Memorial Trust v. Casey*, 2008 ME 63, ¶ 16, 945 A.2d 1211, 1215.

25. There are several problems with the liquidated damages provision in this case:

- because paragraphs 3.A and 3.B prohibit Mr. Hassan and NEC from contacting or soliciting patients and employees of ABHH, as well as accepting them as patients or hiring them as employees, paragraph 5.A would require Defendants to make a $10,000 payment in circumstances involving only contact that caused ABHH to suffer no loss or damage at all as a result of the breach.

- because paragraphs 3.A and 3.B prohibit Hassan and NEC from hiring persons who had already left ABHH's employ up to a year previously, and patients who already had ceased to be served by ABHH up to a year previously, the liquidated damages provision would entitle ABHH to be paid in circumstances when it suffered no actual loss as a

8

result of any action by NEC or Mr. Hassan, and therefore would have no entitlement to actual damages. To illustrate, the nurse Susan Giffin left ABHH's employ in March 2015. There is no evidence that Mr. Hassan or NEC induced her to leave ABHH's employ, but Plaintiffs still claim that they are owed $10,000 because NEC hired her six months after she had left ABHH's employ. The situation is similar with patients—the court cannot determine whether the 19 MaineCare clients who were former ABHH patients were current or former patients of ABHH at the time they were referred to NEC or NHHC. There is no evidence that Defendants contacted or solicited any of the 19, so the record is silent as to whether the Defendants caused ABHH to lose these patients.

26. Thus, the liquidated damages provision calls for a substantial payment to ABHH in circumstances that do not involve any actual loss or damage to ABHH due to the breach. It follows that the $10,000 liquidated damages amount cannot be said to be a reasonable approximation of ABHH's actual loss or damage caused by the breach. Accordingly, the court declines to enforce the liquidated damages provisions of paragraph 5.A.

27. Plaintiffs have not proved any actual losses or damages caused by the breaches. ABHH did submit a trial exhibit indicating that its annual gross revenues have fallen by about $400,000 during the period since May 14. However, these are gross amounts, not net losses, and the high level of competition in the market (there being about 20 home health care business in the Portland area) could be the cause.

28. However, because the Plaintiffs have proved multiple breaches of the Settlement Agreement and Release, they are entitled to relief under two provisions of the Agreement.

29. First, paragraph 5.B of the Agreement entitles ABHH, in the event of a breach by Mr. Hassan and/or NEC, to recover its legal fees incurred in the prior litigation between the

9

parties, which the Agreement says were $20,000. Defendants challenge paragraph 5.B as another liquidated damages provision, but the court views it otherwise. ABHH's $20,000 legal cost is an expense that the parties agreed was actually incurred—it is not a figure akin to the $10,000 liquidated damages number that the parties intended to substitute for an actual loss or expense. From a contractual standpoint, what paragraph 5.B reflects is the parties' agreement that Mr. Hassan and NEC would not be liable for ABHH's legal costs in the prior case unless they breached the Settlement Agreement, in which case they would be liable. Settlement agreements often provide that released claims are resurrected and compensable in the event of a breach of the settlement. This agreement is no different.

30. Plaintiffs also seek an injunction along the lines of the prohibition contained in the Settlement Agreement and Release at paragraph 5.E. *See* Joint Ex. 1 at 3. Paragraph 5.E provides that, in the event of any breach of paragraphs 3.A and 3.B, Mr. Hassan will not operate NEC or any other business in competition with ABHH within 50 miles of ABHH's office, and will not be employed by any competitor of ABHH within 50 miles. At the closing argument, ABHH and Mr. Ali confirmed that they are asking the court to convert what is now a contractual prohibition into an injunction prohibiting Mr. Hassan from operating any business in competition with ABHH, thereby essentially shutting down NHHC, the business Mr. Hassan is now operating. Mr. Hassan and NHHC oppose any award of injunctive relief.

31. A middle ground between the injunction shutting down NHHC and no injunctive relief might be an injunction incorporating the prohibitions contained in paragraph 3.A and 3.E—barring Mr. Hassan and NHHC from contacting, soliciting or engaging as patients or employees any person who was a patient or employee of ABHH within the past year. Neither side is asking for the court to adopt that middle ground, so the court will not consider it further.

10

32. The court declines to adopt ABHH's request for injunctive relief, which would have the effect of shutting down NHHC, for several reasons. First, the circumstances surrounding the execution of the Settlement Agreement and Release raise equitable defenses to injunctive relief—it is said that those who seek equity must do equity, and it does appear that Mr. Ali arranged for Mr. Hassan to be pressured into signing the Settlement Agreement and Release. Mr. Hassan's subsequent ratification of the agreement means that it remains enforceable, but the court retains its discretionary authority to withhold injunctive relief. Also, both sides were reluctant to share employee and patient information, and the injunction would be unworkable unless Mr. Ali gave Mr. Hassan a complete list of patients and employees whom Mr. Hassan could not accept or hire, and Mr. Hassan's compliance could be reliably verified by Mr. Ali. The discovery issues running in both directions that preceded trial raise serious doubt as to whether an injunction would be workable. Lastly, the passage of time is a relevant factor. This action was filed in September 2015, nearly a year after the Settlement Agreement and Release were signed, although it has moved quickly since coming into the Business and Consumer Court in January 2016.

33. Because the Plaintiffs have proved multiple breaches of the Settlement Agreement by NEC, NHHC and Mr. Hassan, paragraph 5.C of the Agreement entitles ABHH to recover reasonable attorneys fees and court costs attributable to the breaches. However, because Plaintiffs did not prevail on two important issues—enforcing the liquidated damages provision and obtaining injunctive relief—the award of attorney fees and costs will be for less than the full amount requested. The fee affidavit filed by Plaintiffs' counsel for fees and costs billed through June 16, 2016 indicates that the fees and incurred and costs incurred are generally reasonable, but the court will reduce the total by 30% to $19,044.55, to reflect the fact that Plaintiffs did not fully prevail.

11

34. The judgment awards both Plaintiffs judgment on the declaratory judgment claim in Count I of the Complaint, but, on Count II of the Complaint, awards only Plaintiff ABHH judgment against the Defendants jointly and severally in the amount of $39,044.55 (the $20,000 for the legal costs of the prior case and the $19,044.55 partial fee award above). The award is in favor of ABHH only because only ABHH is entitled to recover the $20,000 attorney fees from the prior litigation, and because attorney Weyrens' fee affidavit for time through the trial lists only ABHH as the client.

It is hereby ORDERED:

1. Defendants' Motion for Judgment is denied.

2. Judgment is hereby granted to Plaintiffs against Defendants on Count I of the Complaint. The court hereby finds and declares that Defendants are in breach of the Settlement Agreement and Release as set forth above.

3. Judgment is hereby granted on Count II of the Complaint to Plaintiff AB Home Health Care, Inc. against Defendants Noble Elder Care, LLC, Noble Home Health Care, Inc., and Mohamed A. Hassan, jointly and severally, in the amount of $39,044.45, with prejudgment and postjudgment interest. Judgment is granted to Defendants on Count III of the Complaint.

4. Plaintiffs are hereby awarded their costs as prevailing parties.

5. Defendants' counterclaims, having been voluntarily withdrawn during trial, are dismissed with prejudice.

Pursuant to M.R. Civ. P. 79(a), the clerk is hereby directed to incorporate this Decision and Judgment by reference in the docket.

Dated July 6, 2016

A. M. Horton
Justice, Business and Consumer Court