[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
CORRECTEDMEMORANDUM OF DECISION
The plaintiffs, Richard N. Cafro and Janey L. Cafro, have brought this action against the named defendant, Lawrence P. Brophy (hereafter referred to as the defendant) and two other persons, in connection with the construction and sale of a single family home that the plaintiffs purchased from the defendant on November 30, 1993, located at 263 High Street in the Town of Coventry. The plaintiffs' complaint, as amended, is in three counts which assert claims of liability for damages based on the breach of express and implied warranties under sections 47-117 and 47-118 of the New Home Warranties Act, General Statutes §§ 47-116 through 47-121, and the violation of General Statutes § 42-11Oa et seq., the Connecticut Unfair Practices Act (CUTPA).
The real estate listing for the property described it as an "antique barn turned contemporary [in] brand new condition" that had been built in 1989 and that it was being offered for sale by the defendant at a price of $229,000. On October 20, 1993, the plaintiffs and the defendant signed a sales agreement for the purchase price of $218,000, which as originally drafted. provided in paragraph 5 that the "buyer accepts home without any warranty express or implied except for the following: seller shall warranty for a period of one year, the structural integrity of [the] residence and that the major mechanical systems are CT Page 6198 operational." At the time that Brophy signed the agreement, he substituted the word "frame" for the word "integrity", and the change was initialed by both parties so that the express warranty was limited to the "structural frame" of the dwelling rather than to its "structural integrity".
The first witness called by the plaintiffs was Robert Bach, the building official for the town of Coventry, who testified that after he had inspected the structure when it was being built in 1989, he expressed his concerns to Brophy in a letter dated August 3, 1989, about the builder's plans for venting the kitchen roof area so that it would be adequately insulated and the method that he planned to use for the ventilation of the main roof, and that based on the assurances made to him by the defendant at that time that the necessary vents would be installed under the direction of his engineer, Barry Steinberg, and that he fully intended to comply with the requirements of the building code, Bach issued the certificate of occupancy for the home on November 24, 1993. However, just prior to the trial, Bach observed that the roof did not in fact have the soffet vents required under the basic building code, and that without proper ventilation, an excessive amount of moisture would be present in the attic spaces in the winter, causing mold and mildew and the premature "deterioration of all the wood structure [and that] during the summer time, an excessive amount of heat builds up and you literally bake the shingles off the roof."
The principal problems that concerned the plaintiffs prior to the closing were, first, the obviously damp condition of the basement that had caused the carpet to be rolled up and had required the installation of a dehumidifier, which they were told would be corrected by the seller, and second, the dripping of water from the fireplace area in the living room that they believed was caused by some defect in the flashing around the chimney, that they were also led to believe would be repaired. However, the principal differences between the parties in what became a very contentious closing was generated by the position adamantly taken by Brophy (who was not present but gave directions by phone to his attorney, M. Frances Reese) that the property was being sold in "as is" condition subject only to the limited express warranty, as opposed to the plaintiffs' belief that the contractual warranty was an additional benefit that merely supplemented Brophy's obligations that the buyers assumed were naturally and necessarily implicit in the sale of any new home by a builder to its new owners. CT Page 6199
When the plaintiffs came to the closing, Mr. Cafro, who assumed that he was entitled to do so, requested that an escrow be set aside "in case anything in our home malfunctioned or broke or deteriorated or didn't work [because] I'm buying the biggest investment I'm ever going to make in my life [and] I want a warranty on it." When Brophy's attorney told them for the first time that they were buying the house "as is", they refused to proceed until after she had made a phone call, presumably to Brophy, and, according to their testimony, she then told them that they were not buying the house "as is", and based on what they perceived to be a concession on Brophy's part by his lawyer, they went ahead with the closing and decided not to press their demand for an escrow after Reese told them that she was not authorized to do so by her client.
Reese was called as a witness by the defendant and also described the closing as heated and acrimonious because of Cafro's insistence on an escrow and her client' s direction to her that the sale of the home was to be "as is", despite the fact that the sales agreement contained a limited express warranty, but she did not recall that she ever retreated from that position as Cafro had stated in his testimony. She also testified that after she received the buyers' punch list the day before the closing and without consulting with her client as to whether she should do so, she prepared a document "for possible use during the closing" in order to comply with the requirements of General Statutes § 47-118(d) that an implied warranty under the New Home Warranties Act may be excluded or modified only "by a written instrument, signed by the purchaser, setting forth in detail the warranty to be excluded or modified, the consent of the purchaser to exclusion or modification, and the terms of the new agreement with respect to it."
The document prepared by Reese quoted the language of paragraph 5 of the sales agreement that "the buyer accepts home without any warranty expressed or implied" (except for the express limited warranty) and stated that its purpose was "to specifically comply with Connecticut General Statutes 47-116
through 47-121 and more particularly 47-118(d) to limit the warranties otherwise provided." She explained to Brophy on the phone that the buyers did not share his view that this was to be an "as is" sale, and that she had prepared the document to protect him from any later claims by the Cafros that the statutory implied warranties had not been waived, but his CT Page 6200 response was that he didn't believe it was critical that they sign it, and when she told him that the plaintiffs had been advised by their own attorney not to do so, Brophy told her that it was not that important and directed her to go ahead with the closing anyway.
Brophy testified that prior to the closing he had authorized his sales agent, Margaret Fassen, to give the Cafros what he considered to be a "full" one year warranty only if they would agree to pay $225,000 for the house rather than their offer of $218,000 which Brophy originally agreed to accept only in exchange for no warranties at all, and that he offered those alternatives because he assumed that the scope, nature and duration of builders' warranties were proper subjects for negotiation between the parties, and although he was aware that sales of new homes were governed by statute, he had no knowledge of the specific requirements of the New Home Warranties Act because "this was the first house where a warranty issue [had] ever [been raised]." Although Brophy consistently treated the transaction as an "as is" sale, it was the buyers who initiated the request for the inclusion of the express warranty because, in Brophy's words, "[t]hey were concerned with the structural frame of the house, to make sure that it was sound and that the mechanical components operated and they wanted that."
In connection with Brophy's change in the wording of the warranty requested and submitted by the plaintiffs that restricted the warranty to the structural "frame" of the house rather than its structural "integrity", as originally written, Brophy testified that he did not remember the word that he had deleted because he thought it was "inappropriate", but that he was certain that "integrity" was not the word that he had crossed out. After the court and counsel examined the document more closely it was quite apparent that it was the "integrity" of the dwelling itself rather than only its "structural frame" that had been originally requested, Brophy's testimony to the contrary not withstanding.
The plaintiffs had been led to believe that the water problem in the basement that they had discussed with their own real estate agent, Mark Finnegan, who received his information from Margaret Fassen, Brophy's sales agent, was the result of the rupture of a water pipe that had been or would be corrected, but they learned after they moved in on the day of the closing that the condition was much more serious than they had thought because CT Page 6201 the walls became "saturated" with water whenever it rained. Cafro himself cut through the walls and found that a previous attempt had been made to create a channel for the water, but that it had not been pursued to completion, and he tried thereafter to correct the condition using the same method at a substantial cost, but his efforts only resulted in making the basement room livable and did not correct or alleviate the underlying problem. About six months after the closing, Cafro called the defendant to tell him that their roof was leaking and wanted to know if he would repair it, and as Brophy put it, "I reminded him that he chose to buy the house with the limited warranty, which did not include the roof, and that he would be responsible for that repair [and] I also reminded him, of course, that he could have bought the house with a full warranty, and we would have then been responsible." Cafro's recollection of the call was that Brophy responded to his request with an obscenity and told him to sue him if he wanted to get the roof fixed.
On July 26, 1994, counsel for the plaintiffs advised the defendant that he had been retained to represent them with respect to certain "integral structural defects" in their home, and Brophy's reply letter, after quoting the limited express warranty, stated that he was not obligated to correct any "nonstructural frame item [and that any] attempt by the Buyer to enlarge the scope of this warranty will be vigorously defended by us." The specific defects in the house were listed in a letter from the plaintiffs' attorney dated September 2, 1994, and included the plaintiffs' claims that virtually every room in the house was suffering from water leakage from the roof which they stated was completely defective, that there was a serious water problem in the basement, and that the heating and cooling systems were not operating properly.
The only expert witness called by the defendant was Barry Steinberg, a professional civil and structural engineer, who designed the structure of the dwelling based on the architectural plans, and although he stated that the building was slightly modified in the field during construction, its design was essentially his own work product. He stated that the structural elements included steel beams and columns as well as the existing structure which was reinforced during construction so that new wall and floor systems could be added and he also took pictures of the structure in various stages of its construction in 1989.
He stated that he discussed the progress of the construction CT Page 6202 with the building official because of the concerns that Bach had in that it involved the modification of an existing structure which was rather unusual. In August of 1989, he gave Bach a written report of an inspection that he had made regarding a column that was out of plumb that should have been corrected and the need for tightening some of the members that were reinforcing the roof system.
Steinberg testified that he had inspected the house on April 14, 1997, accompanied by Brophy and John Ahern, his partner, who is also a defendant in this case, and who Steinberg referred to as the general contractor and project manager although he was not called as a witness by Brophy at the trial. He stated that although no soffet vents had ever been installed in the roof, he observed that an alternative method of venting by means of "styrofoam spacers" had apparently been used to provide air and prevent dampness, and that he had taken pictures of some of them because he had not been present when they were installed during the construction of the walls and the placement of the insulation.
Although he noted in his written report that "[n]umerous areas of water damage to sheet rock were observed inside", they were not wet, and he observed no evidence of any deterioration within the walls or in the roof sheet rock, although "a detailed inspection would have required opening up the walls to look inside." With respect to the floors and floor beams he stated that there was "not much to observe because of the covering by sheetrock", but that he did see that one beam of the floor system did not have a support and had settled and that although he did not think it was a structural problem, it was a condition "that should be corrected as soon as possible because it is not doing the structure any good."
He also stated that he did not examine the stairway in the basement "in too much depth" because it is not normally considered to be part of the structural frame of the house and that there was only one hairline crack in the clay tile floor of the kitchen that extended through a number of the tiles. He also noted in his report that the roof shingles have "an obvious problem with most shingles showing a horizontal crack [and that a] new roofing membrane should be installed [but he concluded that the] building appears to be in good structural condition with only one beam support observed that should be fixed [and that no] other structural roof, wall, floor or foundation problem CT Page 6203 were observed."
Although Steinberg said that he had worked as an engineer on many of Brophy's projects throughout the state, he had never been asked to supervise or approve the actual work that was being done, and that he had visited the site only twice in the course of its construction, once when demolition of the existing structure began, and again when he was asked to do so by Bach, and that he had no idea of how the house had actually been built or of the materials that were used. He was therefore unable to express any opinion about the quality of the workmanship that went into it because that is something that is hidden and cannot be determined by a visual inspection.
At the conclusion of his testimony, Steinberg noted that the reconstruction of an existing building may give rise to special problems that are not ordinarily encountered in the course of new construction, because of such conditions as dampness in the existing foundation and the presence of old and new lumber which might affect the structural integrity of a reconstructed building. He also pointed out that his professional services in connection with the project ended in the spring of 1989, but at Brophy's request in August of that year he talked to Bach about the concern expressed by the building official about the stability of one of the steel columns and assured him that it would be corrected because it was a structural matter, but that he never had any discussions with Bach about the venting of the roof, nor was he asked to do so, because it was a nonstructural problem that was not a matter of professional concern on his part.
Michael Culmo, an expert witness called by the plaintiffs, was licensed as a professional structural engineer in 1986 after he had received a master's degree in that field, and although he was employed as a bridge design engineer in the state department of transportation before and after 1986, he worked part-time as a structural engineer for ten years with CME Associates, an engineering consulting firm in which he is now the senior structural engineer and was involved throughout that time in evaluations and inspections of existing homes as well as other fairly large and complex structures such as town hall buildings and libraries. He testified after he had reviewed Steinberg's report and computations and after hearing all of Steinberg's testimony at the trial.
Culmo inspected the entire house a few days before Steinberg CT Page 6204 had made his inspection, and in addition to his visual observations he had noted the general size and spacing of the beams and also examined six structural members for bending, shear and deflection. His three major concerns involved a purlin beam from the original structure which supported the roof, the second floor framing and the roof over the kitchen, all of which he found to be significantly overstressed to the point of being dangerous in his opinion.
His opinion about the sloped kitchen roof was based on what he believed to be inadequate attempts to strengthen the rafters as requested by the building inspector during its construction causing the entire rafter system to be overstressed to the point where it could collapse under a heavy snow load, and his opinion about the support system for the second floor was based on his finding that the stress factor was two and one-halftimes above the code requirements. His greatest concern, however, involved the purlin beam that supports the roof over the second floor bedrooms which he found to be stressed by a factor of 4.37 in bending and 4.6 in deflection which he described as "probably the highest stresses I've ever calculated in any house."
Culmo was critical of Steinberg's report because it was based only on a walk-through and visual inspection of the house and described it as a "cursory review" that was not based upon correct computations which are an essential component of an informed opinion by an engineer about the structural integrity of a building. He also stated that although the so-called "heel drop" or "bounce" test that Steinberg relied upon is commonly used by engineers, including himself, and serves a useful purpose, it is unscientific and cannot in itself form the basis for a valid conclusion and he vigorously disagreed with what Steinberg considered to be the best method to estimate the strength of a timber beam, criticizing it as being inconclusive as well as prohibitively expensive under the circumstances of this case.
Culmo stated that the only way the plaintiffs' home could be returned to the condition that had prompted them to purchase it, that is, an open beam framing system and open floors and large living spaces, would be to demolish everything above the first floor and to reconstruct the building. His recommendation was obviously based on the fact that selective demolition and repair would be impossible in this case since the code violations based on Culmo's testimony existed on the second floor, and he stated CT Page 6205 that the costs for demolition and reconstruction would be $180,000.
Culmo stated that he is often called upon by his clients to prepare preliminary cost estimates that are not broken down but are useful to them as a guide for the purpose of receiving bids for projects and that such estimates were given routinely in the regular course of his duties as a professional engineer. His cost estimate of $82.00 per square foot for 2,000 square feet of living space was arrived at by deducting the costs of the foundation, the driveway and the septic system from the cost of the house, and adding the cost of demolition which he estimated to be $20,000 in reaching the sum of $180,000 as his total "ballpark" estimate of the costs that would be involved.
Timothy Foreman was also called as an expert witness by the plaintiffs and stated that he was a home inspector and the owner of Connecticut Building Consultants, an inspection service for home buyers, banks and insurance companies. He is also a federally licensed HUD consultant who inspects properties to determine the repair and rehabilitation costs for buildings in order to make them fit for occupancy, and has also been involved in the building, repair and remodeling of some two hundred homes since 1977.
Foreman testified that he had inspected the house in December of 1995, and observed the absence of soffet vents or of any other adequate means of circulating the air properly and that the "lack of ventilation has caused the roof to age much more rapidly than it should have." His testimony was similar to that given by the building inspector when he stated that without proper ventilation, excessive moisture accumulates in the winter and causes the sheet rock to crack and get wet, and in the summer when the heat cannot escape it "cooks the shingles" by evaporating the asphalt out of them and drastically reducing their life span.
Foreman noted other defects in the roof which included the improper installation of flashing and the probability of irreparable damage to the insulation which would have to be removed, and stated that if a new roof were to have been installed (as the defendant had proposed to do at one time) it would inevitably develop the same problems as a result of the same deficiencies. He also stated that because of the amount of moisture entering the house, it would be likely to cause damage to the rafters, and that the exterior structural walls would CT Page 6206 deteriorate "and start to shrink and fall apart."
He also noted a crack in the tile floor of the kitchen that extended for about eight feet and that indicated to him that the floor underneath was moving, and the fact that the crack was in a concave area showed that the floor was settling because upon closer examination below that area those conditions appeared to be the result of poor workmanship in attempting to tie together old and new construction. He also detected movement on the second floor in that the baseboard was separating from the walls and the doors were making contact with the floor.
Foreman also testified that if no action was taken to deal with the roof and the problems associated with it, the process of deterioration would only accelerate, that in his words, it would "fall apart", and that the house would no longer be habitable. His estimate of the total amount that would be necessary to correct the defects and repair the damage that was likely to be found in the enclosed areas was $174,211.95, and a three page itemized breakdown of the costs of the various kinds of corrective work and replacement that would be required was admitted into evidence and he was questioned at length by counsel for both parties about the necessity for each item and the basis for his computations.
He acknowledged that the estimates that he had made could not be determined with a high degree of accuracy because "the exact damage is not visible without tearing some of the house apart [but that there was] definitely hidden damage", the extent of which could not be determined at that time. He considered it to be a "conservative" estimate because there could be much more damage in the framing that was covered by sheetrock, and he estimated that it would probably take four months to complete all of the work that might be required.
Foreman's estimate had been made early in the trial before Culmo had given his testimony concerning the structural deficiencies in the Cafro home particularly with respect to the second floor level, which led him to conclude that they could not be corrected by selective repair but would require the demolition of the entire structure and its reconstruction. Based on Culmo's opinion as to what he felt was the only practically possible alternative to remedy the situation, the plaintiffs introduced into evidence a revised cost estimate by Foreman in which, using the same methodology he had used for his selective repair CT Page 6207 computation, he had found the total estimated cost to be $210,870.81.
The plaintiffs had also alleged that the heating and cooling systems were not functioning properly in violation of the express warranty that the major mechanical systems in the house were "operational". Christopher Miller, the witness called by the plaintiffs, concluded that the HVAC system was not fully operational because a new larger sized cooling system was needed on the first floor and that the second floor duct work would have to be completely redone at a cost of between $12,000 to $15,000, which he acknowledged was difficult to estimate because much of the duct work was hidden behind sheetrock.
The defendant called John McCurry, a professional engineer, as a witness, and after reviewing the building statistics and data used by Miller, he did his own analysis of the heating and cooling requirements of the residence. He stated in his report that based on his experience as a mechanical engineer for forty-five years that "[t]he system as installed meets or exceeds the required design criteria of the Connecticut Building Code."
Richard Cafro's rebuttal testimony was that the post and beam construction of the house was very important to him because he had always wanted that type of home and that kind of lumber could not be duplicated in a conventionally built structure. He rejected Steinberg's suggestion that any structural problem could be corrected by installing steel beams and rods because that was not what he had contracted to buy, and he also stated that in his opinion the house had no value and that no one would want to buy it in its present condition.
On May 29, 1997, after the evidentiary phase of the trial had been completed, the defendant filed a motion to "re-open their evidence" to allow additional testimony by Steinberg because just prior to that date this court had filed its decision in Mitchellv. Madison Enterprises. Inc., Superior Court, judicial district of Tolland, Docket No. 57188 (May 21, 1997), (hereafter referred to as Madison) a factually similar case that involved the doctrines of waste and selective repair as they apply to actions brought under the New Home Warranties Act. The basis for the motion was that Steinberg would testify that defects of the kind described by Culmo "could be repaired through the employment of selective repair techniques [which] would be significantly less expensive than the method proposed by Mr. Culmo and would thus avoid economic waste [although] Steinberg still maintains that CT Page 6208 the structure is "sound and meets all state building code requirements . . . "
The court overruled the plaintiffs' objection to the motion, and on June 26 and July 1, 1997, it heard Steinberg's supplemental testimony on the issue of selective repair in which he stated that assuming that some structural deficiency was present, it could be easily corrected by installing precut beams reinforced by steel plates. It was his opinion that demolition would not be required and that the necessary reinforcement work could be completed by two carpenters in one day and that the sheetrock would not have to be removed. He also testified that on the basis of the preliminary calculations that he had made, his recommendation would meet building code requirements and suggested that it would be helpful to the court when it viewed the premises to look at the beams that were claimed to be overstressed and "walk across the floor to feel for yourself the soundness of the structure because "[i]t doesn't take a professional [to do so]."
The position consistently taken by the defendant in this case during the prepurchase negotiations between the parties and thereafter, as expressed by Brophy repeatedly in the course of his testimony apparently is that prospective buyers of new homes are not entitled to the protection of implied warranties such as those of workmanlike construction and habitability under subsections (3) and (4) of § 47-118(a) of the General Statutes unless the value of those statutory warranties, as determined by the builder, are factored into the purchase price, thereby requiring them to pay for rights and benefits that they are not likely to be aware of, but which they may already have anyway by virtue of the statute. Express warranties, on the other hand, are distinguishable because they cannot be created unless they are "made a part of the bargain" between the parties under § 47-117, while there is no such requirement for statutory implied warranties, and to suggest otherwise would be to reduce § 47-118 to nothing more than an exercise in legislative futility.
The court concludes, as has already been noted from its review of the evidence, that it was not until the Cafros came to the closing that they were told for the first time by anyone involved in the prepurchase negotiations that there would be no escrow, and that they would be buying the house "as is", and the court also finds that although the plaintiffs may have mistakenly CT Page 6209 believed that Brophy had "thrown in the towel" on his demand that it be sold "as is", the defendant had in fact never done so. It may also be reasonably inferred from his testimony that he had rarely, if ever imposed that requirement on a buyer before, and from his own knowledge of the work being done by the subcontractors who did work on the structure, as well as information from his partner and general contractor, Ahern, about the progress of its construction, that he was fully aware of the potential problems that might arise because of the methods of construction and the materials used to build the structure, including the roof, and that although the nature and extent of those deficiencies and their possible consequences were clearly unknown to the plaintiffs at the time of the sale, he also realized that they would eventually manifest themselves to the homeowners and expose the builder to substantial liability in the future.
The inference that the court has drawn regarding Brophy's knowledge of the latent deficiencies in the structure is reinforced by the contents of the letter from Bach to Brophy dated August 3, 1989, which is apparently based on Bach's mistaken assumption that Steinberg was still actively involved in the project as Brophy's supervising engineer, when in fact his connection with the project had ended in the spring of that year. For example, Bach states in his letter that the rafters in the kitchen had been installed improperly under a stop work order and "[t]hey must be removed and replaced under the direction of yourengineer after he has given you further specifications for installation [and that] this department hopes you retain his services to get this building into a good structural state and one that meets the Connecticut Building Code." (Emphasis added.)
More importantly, the questions put to Brophy by Bach in his letter about the venting of the kitchen roof area and the method that would be used for venting the main roof were not matters that either Brophy or Ahern asked Steinberg to look into despite the fact that Brophy's letter to Bach stated that he had directed Steinberg to contact him "and work out any further issues you may have on this property [in order to] fulfill your wishes [and] rectify your concerns [because my] partner and fully intend to build to Connecticut Building Code requirements." The court finds, therefore, that the town building official's testimony that the certificate of occupancy issued for the Brophy dwelling on November 24, 1993 was based on the assurances made by Brophy that the necessary soffet vents would be installed under CT Page 6210 Steinberg's direction, and that the certification would not have been made if Bach had known at the time that the assurances that he had mistakenly relied upon were false.
The certification by a town building official that a dwelling is fit for occupancy does not insulate the builder from liability for a breach of the implied warranty of habitability because § 47-121 of the General Statutes protects new home buyers against a building inspector's negligent, mistaken or premature certification by means of a statutorily-created implied warranty in favor of the buyer that the "vendor has complied with the building code or [with its] customary application and interpretation [by the] municipality." The purpose of that statutory provision was, as noted by our Supreme Court, to impose liability on the builder-seller in such cases for a period limited to three years from the issuance of the certificate of occupancy, because "noncompliance with the building code often will not be immediately apparent to home owners"; Bartone v.Robert L. Day Co., 232 Conn. 527, 535 (1995); and that is particularly true of latent structural defects, such as those in this case, which are claimed to constitute a breach of the implied warranty of habitability.
Although the court has found that the evidence is sufficient to establish a violation by the defendant of the statutory implied warranty under § 47-121, the defendant argues that the plaintiffs' pleadings are limited to the express and implied warranties under sections 47-117 and 47-118 only. Moreover, the plaintiffs' third amended complaint which was filed after the trial, fails to conform their pleading to their proof, and because they have also failed to brief that issue, the court will deem it to have been waived, and will limit its consideration to the issues of whether the implied warranties were effectively disclaimed, and if the disclaimer was not valid under the statute, whether they were breached, and finally, whether or not any breach of the express warranties was proved by the plaintiffs.
The most obvious deficiency in paragraph five of the sales agreement is that it does not set forth in detail "the warranty to be excluded" as required under General Statutes §47-118(d), and that this omission as well as others were recognized by the defendant's attorney herself when she attempted to persuade Brophy unsuccessfully that the agreement as worded did not comply with the statute. Even in the absence of such a CT Page 6211 statutory requirement, when no specific mention is made of the particular warranty, such as the implied warranty of habitability or of good workmanship, any purported waiver of those warranties is ineffective. Tusch Enterprises v. Coffin, 740 P.2d 1022, 1031
(Idaho 1987).
The party who relies on "a disclaimer of the warranties implied by public policy in a new home purchase must establish that such protections were knowingly relinquished as a result of a bargain in fact, i.e. an agreement reached through discussion and negotiation, and boilerplate clauses in a form contract alone do not establish these requirements." (Emphasis in original.)Crawford v. Whittaker Construction. Inc., 772 S.W.2d 819, 822
(Mo.App. 1989). Moreover, in this case, the fact that the buyers themselves insisted on the inclusion of an express warranty because they were concerned with the structural integrity of the house and its mechanical systems, negates any claim by the builder that there was a knowing and intentional waiver of their statutory rights.
The legal significance of a limited "builder's warranty" such as the one that was the subject of negotiations initiated by the plaintiffs in this case, and made a part of the purchase and sale agreement signed by the parties, in terms of its effect, if any, on the common law and statutory rights of new home buyers has been the subject of a number of federal and state court decisions. The overwhelming weight of authority is that "an express warranty against defects for a limited period of time should not be interpreted as a limitation upon a builder vendor's liability for defective work, and in no way impairs its general obligation to perform the contract in a proper, workmanlike manner [because] the courts have held that the presence of [such] an express warranty is an added guarantee inserted into the contract to extend, rather than limit, liability for faulty construction, and as such does not proscribe the owners' exclusive remedy." Bridges v. Ferrell, 685 P.2d 409 at 411 (Okla.App. 1984).
The implied warranty of habitability covers only latent defects which may well not be discovered until after the first year a buyer takes possession and to allow a one year express warranty to entirely displace an implied warranty of habitability would have the effect of encouraging a seller to disclaim the implied warranty without forcing him to prove that there was a knowing acceptance of such disclaimer on the part of the buyer, CT Page 6212Tassan v. United Development Co., 410 N.E.2d 902, 910 (Ill.App. 1980). The seller could, if he chose to do so, merely "provide an express warranty in the written contract covering all defects for a period of one year, six months, or even a month [thereby precluding] any liability for latent defects without the buyer knowing that such liability has been precluded," and any such limited warranty should not be construed to displace and render non actionable the implied warranty of habitability. Id.
For the foregoing reasons, the court finds no reason to give the defendant the benefit of the required statutory disclaimer that his attorney herself correctly believed to be legally insufficient, and which the buyers refused to sign. Accordingly, the court concludes that the purported "disclaimer" did not comply with the requirements of the statute and the plaintiffs are entitled to the protection of the statutory warranties of workmanlike construction and habitability.
Steinberg's testimony can be given little if any weight by this court because he had been employed by Brophy as an engineer on many of the defendant's projects throughout the state and had an obvious personal and professional interest in defending the quality of his own work product. Moreover, he had no idea of how the structure had actually been built and the court accepts Culmo's testimony that Steinberg's walk-through and visual inspection were clearly insufficient for him to form an informed professional opinion as to the habitability of the structure, and that Steinberg himself acknowledged that he could give no opinion as to the quality of the workmanship that went into its construction.
The factors to be considered in determining the relative weight and sufficiency of expert and opinion testimony include the relative opportunities that the expert witnesses had for study and observation of the subjects about which they testify; 31A Am.Jur.2d, Expert Opinion Testimony § 129; and an expert's opinion must be evaluated in the light of the expert's opportunity to come to a reasoned conclusion. Seymour v. Seymour,180 Conn. 705, 712 (1980). It should also be noted that the failure of the defendant to call his co-defendant, partner and general contractor, Ahern, who was available to testify at the trial about the facts that were critical to the making of an informed opinion by either of the experts, compels the court to draw a strong negative inference (if not an inescapable conclusion), that his testimony would seriously prejudice the CT Page 6213 defendant's case. Secondino v. New Haven Gas Co., 147 Conn. 672,675 (1960).
The court concludes that based on its review of the credible evidence summarized herein, the defendant breached the implied warranties of habitability and construction in a workmanlike manner under § 47-118 of the General Statutes as alleged in the first count and also finds that the defendant breached the express warranty of the "structural frame" of the dwelling in violation of § 47-117 of the General Statutes as alleged in the second count. The court finds, however, that the plaintiffs have not proved that the portion of the express warranty pertaining to the "major mechanical systems" has been violated and finds that issue in favor of the defendant.
The court finds the plaintiffs have proved that the market value of the dwelling is dubious at best by reason of the deficiencies presently existing in the structure, and that in order to make the structure reasonably suited for its intended use as a residence, the existing superstructure must be demolished and removed and replaced with a finished and properly constructed superstructure that meets the requirements of the building code. The court also finds that Culmo's experience as a professional structural engineer qualifies him to make cost estimates for reconstruction based upon recognized and trustworthy sources for such information. See Bryan v. Town ofBranford, 50 Conn. 246, 249-50 (1882).
Accordingly, judgment may enter in favor of the plaintiffs for $180,000.
The court also finds the issues for the plaintiffs on the third count under CUTPA because the defendant knowingly sold the plaintiffs a house with a number of serious defects which were unlikely to be completely detected before sale and then failed to respond to the plaintiffs' requests for corrective measures after the closing. Masure v. Donnelly, 962 F.2d 128 (1st Cir. 1992).
Judgment may therefore be entered in favor of the plaintiffs on the third count for the attorney's fees they incurred in prosecuting their claims to judgment, in the amount of $25,231.50, pursuant to the statute.
Harry Hammer Judge Trial Referee CT Page 6214