STATE OF MAINE                          SUPERIOR COURT
KENNEBEC, SS.                           CIVIL ACTION
                                        DOCKET NO. CV-19-107


THOMAS & AMBER HINTON
    Plaintiffs/Counterclaim Defendants


    V.                                  <u>ORDER ON MOTION</u>
                                        <u>FOR SUMMARY JUDGMENT</u>
THOMAS BOYCE,
    Defendant/Counterclaim Plaintiff


    and

DIANNA PATTERSON,
REALTY OF MAINE, MICHELLE
CASAVANT, CENTURY 21 SURETTE
REAL ESTATE, MICHAEL KEDDY, SR.
d/b/a A-1 AFFORDABLE HOME INSPECTION,
    Defendants


## **INTRODUCTION**

Before the court for resolution is the Motion for Summary Judgment submitted by Defendant Michael Keddy, Sr., d/b/a A-1 Affordable Home Inspection. The Plaintiffs, Jeramy and Amber Hinton, oppose the motion.

The complaint in this matter was filed on May 28, 2019 and seeks damages against all the Defendants in connection with the Hintons' July, 2017 purchase from Defendant Thomas Boyce of property located at 199 Snow Pond Road in Oakland. Prior to purchasing the property, the Hintons hired Defendants Michelle Casavant and Century 21 Surette Real Estate as their exclusive Buyers Real Estate Agents. The Purchase and Sale Agreement was subject to a satisfactory home inspection, which was performed by Keddy on July 11, 2017. Subsequent to their purchase of the property, the Hintons claim that they discovered

1

numerous defects in the home/property that were not disclosed by Boyce, Casavant and/or Century 21 and were not reported by Keddy as part of his inspection report.

In their complaint, the Hintons have asserted the following four causes of action against Keddy: negligent misrepresentation (Count I); intentional misrepresentation (Count II); breach of contract (Count III), and; Unfair Trade Practices Act violation (UTPA) (Count IV).

For purposes of addressing Keddy's motion for summary judgment, there appears to be a number of material facts that are not subject to dispute. The following factual recitation and discussion is based upon the court's review of the summary judgment record.

## FACTUAL BACKGROUND

On July 1, 2017, the Hintons signed a Purchase and Sale Agreement (PSA) for the property located at 199 Snow Pond Road in Oakland. Paragraph 12 of that PSA provided that the Hintons' obligation to close on the property was subject to a satisfactory due diligence investigation by them. According to the PSA, the Hintons had 10 days to perform the due diligence investigation. Michelle Casavant contacted Michael Keddy d/b/a A-1 Affordable Home Inspection about doing an inspection of the property. Keddy indicated that he was available to perform the inspection on July 11, 2017. There is considerable argument between the Hintons and Keddy about the Hintons' desire to be present at the inspection and their inability to be there because they were closing on their home in Denver, Colorado. The bulk of this argument, however, is not material to Keddy as he had a limited role in communicating with the Hintons prior to the inspection on July 11, 2017 and did nothing to prevent them from being present at the inspection.

A "Comprehensive Whole House Inspection Agreement," on the letterhead of A-1 Affordable Home Inspection, was signed by the Hintons and Keddy on July 11, 2017. The cost of the home inspection was a total of $425, consisting of $325 for the inspection plus $100 for a radon test.

2

The contract between Keddy and the Hintons stated: "A-1 Affordable H.I. agrees to provide an inspection for the purpose of alerting the client to any major observable deficiencies in the condition of the property but will not discover or include latent defects or hidden deficiencies." It specifically excluded certain conditions, including the presence of mold.

In bold-faced type, the contract stated:

**THE INSPECTION IS NOT INTENDED OR TO BE CONSIDERED AS A GUARANTEE OR WARRANTY NOR ANY FORM OF INSURANCE EXPRESSED OR IMPLIED, REGARDING THE ADEQUACY, PERFORMANCE, OR CONDITION OF THE PROPERTY, ITEMS AND SYSTEMS INSPECTED AND IT SHOULD NOT BE RELIED UPON AS SUCH.**

Finally, the contract contained the following provision:

It is further understood and agreed that A-1 Affordable Home Inspection, its officers and/or employees assume no liability and shall not be responsible for any mistakes, omissions or errors in judgment beyond the cost of the inspection. The limitations of liability shall include and apply to all consequential damage, bodily injury or property damages of any nature.

Keddy prepared a report of his inspection and emailed it to the Hintons on July 11, 2017. A copy of the report was sent by regular mail and was received by the Hintons on or about July 17, 2017. The report contains a description of the observable deficient conditions Keddy noted at the property. The Hintons' contend that Keddy's report itself was deficient in many respects, including that it failed to disclose observable defects and deficiencies in the condition of the house. Moreover, the Hintons contend that they received a report from Keddy that contained photographs of poor quality.

The report prepared by Keddy stated that "[t]he home is overall in pretty good condition." Nevertheless, the report also pointed out numerous issues that needed to be addressed. The Hintons contend that after they closed on the property and moved into the

3

home, they discovered several major defects and deficiencies in the house that should have been disclosed to them by Keddy and the other Defendants, including high levels of mold and water leakage into the home. The Hintons contend that they relied upon Keddy's report in purchasing the home and have been damaged as a result of Keddy's misrepresentation, lack of disclosure and breach of contract.

In response to Keddy's request for a more definite statement, the Hintons alleged that Keddy conspired with the other Defendants in the case, and received a "kickback," for giving an inaccurate and incomplete home inspection report. The Hintons allege that Keddy was part of a deliberate scheme to defraud them into buying the property with its known defects. The Hintons acknowledge that Keddy did not have any fiduciary relationship with them.

## SUMMARY JUDGMENT STANDARD

"The function of a summary judgment is to permit a court, prior to trial, to determine whether there exists a triable issue of fact or whether the question[s] before the court [are] solely . . . of law." *Bouchard v. American Orthodontics,* 661 A.2d 1143, 1144 (Me. 1995). "A trial court properly grants summary judgment for the movant if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Beaulieu v. Aube Corp.,* 2002 ME 79, ¶ 14, 796 A.2d 683 (citing *Stanton v. University of Maine Sys.,* 2001 ME 96, ¶ 6, 773 A.2d 1045). A "material fact" is one that can affect the outcome of the case, and a genuine issue exists when there is sufficient evidence for a fact-finder to choose between competing versions of the facts. *Lougee Conservancy v. City-Mortgage, Inc.,* 2012 ME 103, ¶ 11, 48 A.2d 774. The party opposing summary judgment may not rest upon mere allegations, and instead is required to come forward with competent and admissible evidence to support each element of his claims. *First Citizen Bank v. M.R. Moddy, Inc.,* 669 A.2d 743, 744 (Me. 1995).

4

## DISCUSSION

By virtue of his motion for summary judgment, Keddy claims that he is entitled to judgment as a matter of law on all four counts of the complaint.

### Count I – Negligent Misrepresentation and the Economic Loss Doctrine

In *Chapman v. Rideout*, 568 A.2d 829, 830 (Me. 1990), the Law Court adopted the tort of negligent misrepresentation as formulated in *Restatement (Second) of Torts* § 552(1) (1977):

> One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

While at first glance the tort of negligent misrepresentation may appear to be generated by the facts alleged in this case, Keddy has raised the so-called Economic Loss Rule or Doctrine as a bar to the bringing of such a claim under the factual circumstances presented here. The Economic Loss Rule was first recognized in Maine in *Oceanside at Pine Point Condominium Owners Ass'n v. Peachtree Doors*, 659 A.2d 267 (Me. 1995). *Oceanside* involved a condominium building that sustained significant water damage allegedly as a result of defective windows manufactured by Peachtree. The condominium association and some condominium owners sued Peachtree alleging negligence, negligent misrepresentation, breach of warranty, unfair trade practices and product liability. The trial court granted Peachtree's motion for summary judgment as to the negligence, negligent misrepresentation and product liability counts, on the basis of the Economic Loss Doctrine.

The Law Court explained that the majority of jurisdictions "do not permit tort recovery for a defective product's damage to itself." *Id.* at 270. This view, called the economic loss doctrine, refers to those "damages for inadequate value, costs of repair and

5

replacement of defective product, or consequent loss of profit – without any claim of personal injury or damage to other property." *Id.* at 270, n. 4, *quoting Moorman Mfg. Co. v. National Tank Co.,* 435 N.E.2d 443, 449 (Ill. 1982). The Court described the reasoning behind the rule as being that when a product suffers damage to itself only, it simply means that the customer has not received sufficient product value, which is the very purpose of express and implied warranties.

*Oceanside,* of course, dealt with a product liability claim. The question that has not been addressed by the Law Court, but with which other courts in Maine and elsewhere have struggled, is whether the Economic Loss Doctrine applies to service contracts, such as the home inspection contract between Keddy and the Hintons. The courts that have considered the question have reached different results.

For example, in *Me. Rubber Int'l v. Envtl. Mgmt. Group, Inc.,* 298 F. Supp.2d 133 (D. Me. 2004), Judge Hornby held that the reasoning of *Oceanside* should be applied to service contracts, such as an agreement to perform an environmental site assessment. The court ruled that the parties (two commercial entities) bargained for the contract they signed and the plaintiff should be left to its remedies under its breach of contract claim. The court acknowledged: "The difficult question is whether Maine would carve out an exception to the economic loss doctrine for professional service contracts," involving, for example, lawyers, doctors, surveyors, engineers and others who are regulated and licensed and where the Legislature has created a cause of action for professional negligence. 298 F. Supp. 2d at 137.

A similar result was reached in *Tetra Tech Constr. Inc. v. Summit Natural Gas,* 2016 U.S. Dist. LEXIS 90597 (2016) (Nivison, M.J.), involving a contract for the construction of a gas pipeline. "The economic loss doctrine 'marks the fundamental boundary between the law of contracts, which is designed to enforce expectations created by agreement, and the law of torts, which is designed to protect citizens and their property by imposing a duty

6

of reasonable care.'" *Id.* at *7 *quoting Fireman's Fund Ins. Co. v. Childs*, 52 F. Supp.2d 139, 141 (D. Me. 1999).

More recently, Judge Hornby noted "the difficulties this court and the Maine Superior Court have had in defining the doctrine's scope." *Fletch's Sandblasting & Painting, Inc. v. Fay*, 2019 U.S. Dist. LEXIS 67234, 3 (D. Me). He pointed out that the Law Court has not spoken on the subject of the economic loss doctrine since *Oceanside* in 1995,[1] and how the Law Court might view the doctrine "is even murkier today," in light of the adoption of the *Restatement (Third) of Torts,* which discusses the economic loss "controversy," but narrows the defense so that it is limited to parties that have contracts. *Restatement (Third) of Torts* § 3, cmt. a.

The caselaw this court has examined appears to be divided into two categories when it comes to the economic loss doctrine. One group of cases treats the economic loss rule as a bar to a negligent misrepresentation claim. Cases in this category include: *Gannett v. Pettigrew*, 2005 U.S. Dist. LEXIS 1357 (D. Me) (Kravchuk, M.J.) (in boat construction contract, economic loss rule bars negligent misrepresentation cause of action because such a claim is indistinct from breach of contract); *Bayreuther v. Gardner*, 2000 Me. Super. LEXIS 140 (Mills, J.) (design and inspection of peat septic system – negligence claim is barred by economic loss doctrine); *L.L. Bean, Inc. v. United States Mineral Prods., Co.,* 1999 Me. Super. LEXIS 323 (Crowley, J.) (mold and fungi found in fireproofing material – economic loss rule bars claim for negligence); *Brett v. Lovejoy*, 2011 Me. Super. LEXIS 19, *6 (Brennan, J.) (faulty installation of septic system – economic loss rule "clearly" bars tort action where claims are based on failure to meet contract standards); *Dcci v. Parker*, 2015 Me. Bus. & Consumer LEXIS 42 (Horton, J.) (purchase and sale of "muscle" car – economic loss doctrine bars negligent misrepresentation claim); *Arundel Valley, LLC v.*

---

[1] In *Dunelawn Owners' Ass'n v. Gendreau*, 2000 ME 94, ¶ 10, n. 11, 750 A. 2d 591, the Law Court declined to address the economic loss doctrine in the context of that case.

*Branch River Plastics, Inc.,* CUM-BCD-CV- 2013-15 (Horton, J.) (economic loss doctrine bars tort claims in what is fundamentally a breach of warranty case); *Maine-ly Marine Sales & Serv., Inc. v. Worrey,* 2006 Me Super. LEXIS 79, * 6 (Warren, J.) (contract to winterize boat – economic loss doctrine applies to service contracts). *See also White v. Mood,* 2020 Del. Super. LEXIS 112 (home inspection contract – economic loss doctrine bars home buyer's tort claims since they are the same as breach of contract claims).

Another line of cases, however, holds that the tort of negligent misrepresentation is an exception to the economic loss doctrine. Cases in this category include: *Orr v. Teledyne,* 1994 Me. Super. LEXIS 190 (Lipez, J.) (contract for sale of airplane – Maine would recognize negligent misrepresentation as an exception to the economic loss rule); *Pendleton Yacht Yard, Inc v. Thomas H.H. Smith & Marine Design & Survey, Inc.,* 2001 Me. Super. LEXIS 49 (Marden, J.) (survey and inspection of boat – economic loss rule is not a bar to negligent misrepresentation claim against certified marine surveyor); *Camden National Bank v. D & F Properties, LLC,* CUM-BCD-WB-RE-2010-16 (Nivison, J.) (citing cases for the proposition that negligent misrepresentation is an exception to the economic loss doctrine). *See also Glassford v. Dufresne & Assocs., P.A.,* 2014 Vt. Super. LEXIS 26 (inspection of septic system – negligent misrepresentation appears to be an exception to the economic loss rule).

The economic loss doctrine has been called "one of the most confusing doctrines in tort law." R. Joseph Barton, *Drowning in a Sea of Contract: Application of the Economic Loss Rule to Fraud and Negligent Misrepresentation Claims,* 41 Wm. & Mary Law Review 1789 (May 2000). At least one court has said that the economic loss rule has proven to be a misnomer and that it should be more properly understood and characterized as the "independent tort duty" doctrine, which allows an injury to be "remediable in tort if it traces back to the breach of a tort duty arising independently of the terms of the contract." *Eastwood v. Horse Harbor Found., Inc.,* 241 P.3d 1256, 1261-62 (Wash. 2010).

A case the parties have spent a considerable amount of time debating is *Morgan v. Criterium-Mooney Engineers*, CUM-CV-2007-381 (December 16, 2009) (Cole, J.). In that case, the plaintiff was interested in purchasing residential property in Portland. She hired Criterium-Mooney to perform a standard pre-purchase home inspection. The contract signed by the parties stated that it was for a "limited visual inspection to identify significant deficiencies . . . . in the major systems . . . ." The contract contained language making it clear that the inspection was not intended to be a guarantee or warranty "regarding the condition of this building." Moreover, the contract limited the liability of Criterium-Mooney for any loss "due to any cause" to the cost of the inspection fee, i.e., $590.00.

Criterium-Mooney performed the inspection and prepared a report. The report made note of some water seepage into the basement, but indicated that it did not appear to be "extensive." The plaintiff purchased the home and later experienced flooding through the foundation of the home. She also claimed that there was water infiltration in the above-ground floors.

As the Hintons have done here, the plaintiff in *Morgan* sued Criterium-Mooney, the home inspector, for breach of contract, negligent misrepresentation, fraudulent misrepresentation and for violations of the UTPA. Criterium-Mooney moved for summary judgment, in part based on the economic loss doctrine.

Justice Cole pointed out that the applicability of the economic loss doctrine to service contracts was "unsettled." Relying on *Graves v. S.E. Downing Registered Land Surveyor, P.A.*, 2005 ME 116, 885 A.2d 779 and *Pendleton Yacht Yard*, 2003 Me. Super. LEXIS 49 (Marden, J.), Justice Cole concluded that "the rule in Maine appears to be that an action brought on a professional services contract breached solely through allegedly negligent performance sounds in tort rather than contract." Noting that engineering is a licensed occupation for which the Legislature has provided a cause of action for malpractice or professional negligence (14 M.R.S. § 752-A), the court held that, independent of the terms of the home inspection contract, Criterium-Mooney was obligated

to exercise due care in providing professional advice as an engineer. The plaintiff's negligent misrepresentation claim survived summary judgment because the exercise of reasonable care or competence would be the degree of care that an ordinarily competent engineer would exercise in like circumstances. In essence, Justice Cole found that the economic loss doctrine did not bar a negligent misrepresentation claim where the defendant owed a duty of care independent of the contractual relationship between the parties. In the case of an engineer (or lawyer, doctor, surveyor, or similar professional), an independent duty of care exists by virtue of state licensing regulations and statutory causes of action for professional negligence.[2]

This would seem to bring our analysis back to where we began, with the court in *Me. Rubber* questioning whether Maine "would carve out an exception for the economic loss doctrine for professional service contracts." 298 F. Supp. 2d at 137. At least two Superior Court justices (Cole and Marden) have recognized such an exception. The question posed in this case is whether such an exception applies to service contracts that do not involve a licensed and regulated professional subject to a standard of care, for the beach of which a malpractice or professional negligence cause of action exists.

In this case, Keddy, d/b/a A-1 Affordable Home Inspection, is not subject to any licensing requirement and no statutory cause of action for professional negligence appears to exist. The relationship between the Hintons and Keddy is purely contractual, and the negligent misrepresentation claim made against Keddy arises from that contractual relationship. In essence, the Hintons' negligent misrepresentation claim is based on Keddy's allegedly negligent performance of the contract. The negligent misrepresentation claim is indistinguishable from the breach of contact claim.

---

[2] The court in *Morgan* also found that the limitation of liability, as contained in the contract, was not effective to shield Criterium-Mooney from negligence liability. Moreover, it found that it was against public policy as applied to intentional or reckless conduct. *See Reliance Nat'l Indem. V. Knowles Indus. Servs., Corp.*, 2005 ME 29,¶ 15, 868 A.2d 220.

As Justice Horton observed:

> Injecting negligence liability into what is fundamentally a breach of warranty case not involving any damage to person or property would be inappropriate, because it would displace predictable contractual and warranty liability defined in the course of the transaction in favor of tort liability determined after the fact. The world of contract depends [in] large part on predictability of rights and obligations. Clearly, when a product causes personal injury or property damage, the harm can legitimately be viewed as a breach of a societal duty sounding in tort, as well as a breach of contractual and warranty duty, and tort remedies come into play, but when the product simply fails to perform as expected or guaranteed, there is no reason to depart from contractual and warranty remedies. This is essentially the basis for the *Peachtree* decision, and the court is constrained to follow it.

*Arundel Valley, LLC v. Branch River Plastics, Inc.*, CUM-BCD-CV-2013-15 (November 5, 2014) (Horton, J.) at p. 11.

Here, Keddy's alleged breach of his contractual obligations did not result in any personal injury and did not result in any property damage. Although the Hintons have asserted that "[t]heir damages are far more extensive than a breach of contract," there is no evidence that there was any personal injury or damage to other property as a result of Keddy's allegedly negligent inspection of the property. Accordingly, the court finds that the economic loss doctrine applies to Count I of the complaint and Keddy is entitled to summary judgment on the negligent misrepresentation claim. *See Restatement (Third) of Torts* § 3 ("Except as provided elsewhere in this restatement, there is no liability in tort for economic loss caused by negligence in the performance or negotiation of a contract between the parties").

### Count II – Intentional Misrepresentation

In Count II of their complaint, the Hintons have asserted a claim for fraudulent or intentional misrepresentation. To establish fraudulent misrepresentation, the Hintons must establish five elements: (1) a false representation (2) of a material fact (3) with knowledge of its falsity or in reckless disregard of whether it is true or false (4) for the purpose of inducing another to act or to refrain from acting in reliance on it, and (5) the other person

11

justifiably relies on the representation as true and acts upon it to the damage of the plaintiff. *Cianchette v. Cianchette*, 2019 ME 87, ¶ 20, 209 A.3d 745; *Me. Eye Care Assoc., P.A., v. Gorman*, 2006 ME 15, ¶ 19, 890 A.2d 707. The elements of fraudulent misrepresentation must be proven by clear and convincing evidence. *Gorman*, 2006 ME 15, ¶ 16; *St. Francis de Sales Fed. Credit Union v. Sun Ins. Co. of N.Y.*, 2002 ME 127, ¶ 26, 818 A.2d 995.

The Hintons have alleged that Keddy, along with at least some of the other Defendants, were engaged in a civil conspiracy pursuant to which Keddy allegedly received a "kickback" or some other pecuniary benefit to provide a false and misleading inspection report to induce the Hintons to buy the property. The Hintons have produced no evidence to support this allegation. Nevertheless, they contend that summary judgment is not appropriate at this time because they have been unable to conduct the discovery necessary to support their claim. By means of an affidavit from their attorney, the Hintons argue that they have attempted to gain access to the financial records of the Defendants, but that the Defendants have refused to provide that information in discovery and the "discovery dispute" has not yet been resolved.

The court would point out that there is no "discovery dispute" before it. The court did issue a Rule 26(g) Order on January 24, 2020. One of the reasons for the court's order at that time was that the court had not been provided with a complete copy of the interrogatories and responses thereto, or the request for production of documents and responses/objections thereto. Thus, the court was unable to make any ruling and denied the Hintons' request to order Keddy to supplement his discovery responses.

The court notes that the discovery deadline in this case is September 27, 2020. The court is unaware of what discovery efforts are still underway, or why it has not been possible for the Hintons to obtain the information that would arguably support their fraudulent misrepresentation claims.

M.R.Civ.P. 56(f) provides:

Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

The court will treat Attorney Davis's Affidavit as a Rule 56(f) request to defer ruling on the motion for summary judgment. The court has considerable discretion under Rule 56(f). *See S. Portland Police Patrol Ass'n v. City of S. Portland*, 2006 ME 55, ¶ 11, 896 A.2d 960. The court will defer ruling on the summary judgment motion as to Count II until at least September 8, 2020. The Hintons may provide additional affidavits on or before that date to support their fraudulent misrepresentation claim in Count II. Keddy will have 21 days to respond to any such affidavits. Thereafter, the court will rule on Keddy's motion for summary judgment as to Count II.

### Count III – <u>Breach of Contract</u>

The contract between the Hintons and Keddy called for Keddy to provide an inspection "alerting [the Hintons] to any major observable deficiencies in the condition of the property." The contract explicitly stated that the inspection would be limited to certain areas and/or components of the property. Based on the summary judgment record, the court finds that there are genuine issues of material fact in dispute as to whether Keddy breached his contractual obligation to provide an inspection as required by the contract. The court also finds that the limitation of liability contained in the contract is valid as to any breach of contract claim. *See White v. Mood*, 2020 Del. Super. LEXIS 112, * 13. Any damages as a result of the breach of contract in this case would be difficult to ascertain at the time of entering into the contract. Accordingly, it was reasonable for the parties to limit the liability of Keddy under the contract to the cost of the inspection fee. The motion for summary judgment as to Count III will be denied, except that the limitation of liability is reasonable and enforceable.

13

**Count IV – Unfair Trade Practices Act**

The Maine Unfair Trade Practices Act (UTPA) prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." 5 M.R.S. § 207. "An act or practice is deceptive if it is a material misrepresentation . . . that is likely to mislead consumers acting reasonably under the circumstances." *Maine v. Weinschenk*, 2005 ME 28, ¶ 17, 868 A.2d 200. "[A] consumer has no private action under the UTPA, even if unfair trade practices have in fact ben committed, unless those practices have not only harmed the consumer but also benefitted the dealer." *Kleinschmidt v. Morrow*, 642 A/2d 161, 165 (Me. 1994) *quoting Drinkwater v. Patten Realty Corp.*, 563 A.2d 772, 777 (Me. 1989).

Keddy has argued that the contract with the Hintons provided for him to be paid regardless of the results of his inspection. Accordingly, the contract, by itself, is not enough to find a UTPA violation. The parties appear to agree that the Hintons must produce some evidence that Keddy stood to gain something additional in order to support a violation of the UTPA.

The Hintons maintain that further discovery may produce evidence to support their theory that Keddy and others were engaged in some type of scheme to defraud them and profit by providing a misleading home inspection report. For the reasons already discussed with respect to Count II (Intentional Misrepresentation), the court will treat Attorney Davis's Affidavit as a request under Rule 56(f) to defer ruling on the summary judgment motion. The Hintons may submit additional affidavits on or before September 8, 2020. Keddy will be allowed 21 days to respond. Thereafter, the court will rule on the summary judgment motion as to Count IV of the complaint.

## CONCLUSION

The entry is:

Keddy's motion for summary judgment as to Count I of the complaint (negligent misrepresentation) is GRANTED.

14

Keddy's motion for summary judgment as to Count III of the complaint (breach of contract) is DENIED, except that the limitation of liability for breach of contract is found to be valid and enforceable.

Keddy's motion for summary judgment as to Counts II and IV of the complaint (intentional misrepresentation and UTPA violations), is deferred. The Hintons may submit additional affidavits regarding Counts II and IV only on or before September 8, 2020. Keddy shall have 21 days to reply. Thereafter, the court will rule on the summary judgment motion with respect to Counts II and IV.

The clerk is directed to enter this Order on the docket for this case by incorporating it by reference. M.R. Civ. P. 79(a).

Dated: August 14, 2020

Entered on the docket 8/17/2020

William R. Stokes
Justice, Superior Court

15

STATE OF MAINE                                    SUPERIOR COURT
KENNEBEC, SS.                                     CIVIL ACTION
                                                  DOCKET NO. CV-19-107


THOMAS & AMBER HINTON
       Plaintiffs/Counterclaim Defendants


V.

                                    **ORDER ON PENDING MOTIONS**

THOMAS BOYCE,
       Defendant/Counterclaim Plaintiff

and

DIANNA PATTERSON,
REALTY OF MAINE, MICHELLE
CASAVANT, CENTURY 21 SURETTE
REAL ESTATE, MICHAEL KEDDY, SR.
d/b/a A-1 AFFORDABLE HOME INSPECTION,
       Defendants


                                    **INTRODUCTION**

       The matters before the Court in this litigation are the following motions: Defendant
Michael Keddy's Motion for Judgment on the Pleadings as to Defendant Thomas Boyce's
cross-claim; Defendant Michelle Casavant's and Century 21's Motion to Dismiss
Defendant Thomas Boyce's cross-claims, and; Defendant Thomas Boyce's Motion to
Dismiss Plaintiff's complaint. The following background is taken from the allegations in
the Plaintiff's Complaint.


                                           1

## BACKGROUND

Jeramy and Amber Hinton are a married couple with four children who moved to Maine in August 2017 after previously living in Denver, Colorado. Sometime in June 2017, they began planning in earnest to move to Maine and, to that end, contacted and hired Michelle Casavant and Century 21 as their exclusive Buyer's Real Estate Agents. The Hintons were looking for a move-in ready house in central Maine, with right of way access to a lake, in the price range of $140,000 -- $160,000, but were willing to spend an additional $20,000 if the house did not need major repairs.

On June 23, 2017, Thomas Boyce, married to Valerie Toulouse until October 2013, completed a Seller's Property Disclosure and Lead Paint Disclosure with Dianna Patterson and Realty of Maine, and listed his house at 199 Snow Pond Road, Oakland, Maine (the "Property") for sale. On July 1, 2017, after the Hintons had visited a few houses in Maine, Casavant notified them of the Property, saying it had "just popped up." After spending only a few minutes visiting the Property (after Casavant told them there was no Disclosure for them and they had only 5 minutes to view the Property), Casavant told the Hintons that Boyce was installing a water filter system in the Property because arsenic levels were "a few points high." Casavant also "repeatedly" told the Hintons that the Property had no material defects and had a right of way access to the nearby lake. Accordingly, she encouraged the Hintons to add the additional $20,000 to secure the Property.

Based on these assurances, the Hintons made an offer, contingent on the Property having a right of way access to the lake, getting the Disclosure, water test results and a thorough inspection to confirm that no repairs were required. Casavant also recommended that the Hinton's hire Michael Keddy of A1 Affordable Home Inspection. Casavant, however, failed to notify the Hintons that they had ten days after the date they signed the Purchase and Sale Agreement to have Keddy inspect the Property, and that they would be able to revoke their offer if the inspection revealed material defects. The Hintons needed to fly back to Colorado to attend the closing of their property there on July 7, 2017. Despite

2

their willingness to remain in Maine during that time to attend the Keddy inspection, Casavant encouraged the Hintons to keep their plans, reassuring them that she would be "their eyes and ears during the inspection." Thus, the Keddy inspection occurred on July 11, 2017 when the Hintons were in Colorado. Shortly thereafter, Keddy emailed the Hintons a partial report, which reported no major defects. After Casavant conducted a final walk through and reported that "everything looks great" on July 19, 2017, the Property closing occurred the following day, while the Hintons were still in Colorado.

On August 5, 2017, the Hintons and their children moved into the Property and stored many of their belongings in the basement. Five days later, on August 10, 2017, the Hintons left a message for Casavant that more than a foot of water had flooded their basement, and their belongings were floating around and had sustained major water damage. In early October 2017, the Hintons met with Casavant's supervising broker, Courtney Blood, at the Property about getting a resolution for the many undisclosed defects, with the Hintons telling Blood that they would not have purchased the Property had they known that such flooding would occur, and at least would have tested for mold. Blood responded by admitting that the Hintons should have been notified about the "water damage."

Despite Blood's assurances, Century 21 and Casavant failed to aid the Hintons in contacting the other parties to resolve the material defects. On October 27, 2017, the Hintons had a water test conducted, which showed arsenic levels "almost triple the legal limit for residential drinking water." In addition, the Hintons hired Craig Wilson of Icon Environmental Consultants to perform a Site Inspection and Indoor Air Quality Test (IAQ) on June 16, 2018, which detailed visible moisture damage and mold throughout the Property, and several inches of water flooding the basement. The IAQ showed that the spore count exceeded the normal value. The IAQ also showed multiple types of mold in the attic, the basement, and the master bedroom. The Hintons also subsequently discovered that the Property in fact does not have a right of way access to the lake. As of the date of

the Complaint, the Property still has roof and foundation leaks, mold pollution, and other material defects.

## STANDARD OF REVIEW

After the Hintons filed this lawsuit, Thomas Boyce (Boyce) filed several claims of his own. In addition to bringing a counter-claim against the Hintons for Intentional Infliction of Emotional Distress, Boyce filed cross-claims against Defendants Century 21 Surette Realty, Michelle Casavant, and Michael Keddy, d/b/a A1 Affordable Home Inspection. Those Defendants filed two separate motions to dismiss Boyce's cross-claims.[1] In addition, Boyce filed a motion to dismiss the Plaintiff's complaint, meaning the Court has three pending motions before it, all of them motions to dismiss. (Valerie Toulouse also previously filed a motion to dismiss the Plaintiff's complaint, but because she was dismissed as a Defendant by order dated 1/10/2020, that motion is now moot).

When reviewing a motion to dismiss under Rule 12(b)(6), courts "consider the facts in the complaint as if they were admitted." *Bonney v. Stephens Mem. Hosp.*, 2011 ME 46, ¶ 16, 17 A.3d 123. The court views the complaint "in the light most favorable to the plaintiff to determine whether it sets forth elements of a cause of action or alleges facts that would entitle the plaintiff to relief pursuant to some legal theory." "A dismissal should only occur when it appears 'beyond doubt that a plaintiff is entitled to no relief under any set of facts that he might prove in support of his claim.'" *McAfee v. Cole*, 637 A.2d 463, 465 (Me. 1994) (internal quotations omitted). As previously noted, Keddy filed a Motion for Judgment on the Pleadings to dismiss Boyce's cross-claim, but this is essentially the same as a motion to dismiss for failure to state a cliam. *See Cunningham v. Haza*, 538 A.2d 265, 267 (Me. 1988); *see also Burke v. Hamilton Beach Division*, 424 A.2d 145, 148 (Me.

---

[1] As noted above, Keddy's motion is technically a Motion for Judgment on the Pleadings. Because a motion for judgment on the pleadings, however, is essentially the same thing as a motion to dismiss, *see MacKerron v. MacKerron*, 571 A.2d 810, 813 (Me. 1990) ("A defendant's motion for judgment on the pleadings is the equivalent of a defendant's motion to dismiss for failure to state a claim"), the Court considers Keddy's motion concurrently with Casavant's and Century 21's motion to dismiss.

4

1981). "When, as in this case, a motion under M.R. Civ. P. 12(b)(6) for judgment on the pleadings is filed by a defendant, only the legal sufficiency of the complaint is tested. Defendant's motion for judgment on the pleadings is nothing more than a motion under M.R. Civ. P. 12(b)(6) to dismiss the complaint for failure to state a claim upon which relief can be granted." *Cunningham*, 538 A.2d at 267. Thus, all three of the motions before the Court are subject to the same standard.

## DISCUSSION

### Keddy, Casavant, and Century 21's Motions to Dismiss Boyce's Cross-Claims

In his cross-claims, Boyce requests contribution and indemnification from those three Defendants from any and all judgments rendered and sums adjudged against him. As the Defendants correctly argue, contribution is available for only one of the four counts the Plaintiff has brought, and that claim is covered by Maine's comparative negligence statute, meaning Boyce's motion is moot as to that last count.

"The right of one joint tort-feasor to contribution from another is a derivative right based upon a final determination that negligence of the cross-claim defendant contributed to the plaintiff's injury." *Packard v. Whitten*, 274 A.2d 169, 174 (Me. 1971). "The underlying policy supporting the right to contribution between joint tortfeasors espoused by this Court does not rest in contract." *Roberts v. American Chain & Cable Co.*, 259 A.2d 43, 48 (Me. 1969). Contribution is an equitable remedy founded on acknowledged principles of "natural justice," and is available only for unintentional tortfeasors. *Hobbs v. Hurley*, 104 A. 815 (Me. 1918); *see also Packard*, 274 A.2d at 179. Accordingly, contribution is not available for Count II – intentional misrepresentation, Count III – Breach of Contract, and Count IV – Violation of Unfair Trade Practices Act.

This means that only Count I – Negligent Misrepresentation - can potentially support a claim for contribution. And as the *Packard* Court noted and subsequently ruled, the adoption of Maine's comparative negligence statute, 14 M.R.S.A. § 156, essentially takes the place of the prior rule of contribution. *See Packard*, 274 A.2d at 179-80. Because of

5

that statute, contribution is now based upon percentages of causal fault among defendants, independent of any cross-claim for contribution. *Id.* ("More than five years' experience in apportioning causal fault under our Comparative Negligence law convinces us that this change as to contribution will result in no insuperable difficulties for the courts or juries. We hold, then, that any contribution by joint tort-feasors shall be in proportion to the contributions of each one to the damages suffered by the Plaintiff.").

With respect to the related but distinct concept of indemnification, the Law Court has held that indemnification is available only in three specific instances. "(1) indemnity may be agreed to expressly; (2) a contractual right of indemnification may be implied from the nature of the relationship between the parties; or (3) a tort-based right to indemnity may be found when there is a great disparity in the fault of the parties." *Emery v. Hussey Seating Co.*, 697 A.2d 1284, 1287 (Me. 1997). Because Boyce has not alleged any facts that would suggest that any of these three instances are present here, indemnity is not available to him either.

Thus, because the Maine Comparative Negligence statute covers the extent that Boyce is able to recover contribution, and because indemnification is not available, the Court agrees with Defendants Keddy, Casavant and Century 21 that Boyce's cross-claims against them should be dismissed.

<u>Boyce's Motion to Dismiss Plaintiff's Complaint</u>

Boyce's motion to dismiss is little more than a one-page document that asserts that because the case was not brought to mediation before the Hintons filed suit, the case should be dismissed, based on paragraph 17 of the Purchase and Sale Agreement. The Court remains unpersuaded for two reasons: First, the Hintons assert that they repeatedly attempted to bring their grievances to mediation, only to receive no response from any of the Defendants, and that they filed this suit in court only after months of no response. Second, that clause (¶ 17 of the PSA) only comes into play if the party that initiated suit

6

"loses in that subsequent litigation." Since discovery on this case has not even finished, it is far too early to decide whether or not this clause will become applicable.

A motion to dismiss tests only the legal sufficiency of the complaint, taking the facts in the complaint as true. Under this standard, the Hintons have alleged sufficient facts to set forth causes of action for Misrepresentation (either negligent or intentional) and Breach of Contract. The Hintons were allegedly told that they were purchasing a house with no material defects and with a right of way access to the lake, and the Purchase and Sale Agreement allegedly stated the same as well. They allege that what they purchased instead was a house with chronic flooding, mold and air quality problems, and one without a right of way access to the lake. This sufficiently alleges Misrepresentation and Breach of Contract.

## CONCLUSION

The entry is:

Defendant Michael Keddy's Motion for Judgment on Pleadings as to Defendant Thomas Boyce's cross-claim is GRANTED. Defendants Michelle Casavant and Century 21 Surette Real Estate's Motion to dismiss Defendant Thomas Boyce's cross-claim is GRANTED. Defendant Thomas Boyce's motion to dismiss Plaintiff's complaint is DENIED.

The clerk is directed to enter this Order on the docket for this case by incorporating it by reference. M.R. Civ. P. 79(a).

Dated: February 20, 2020

William R. Stokes
Justice, Superior Court

7